Daniels, executor, vs. Foster and others.

---

DANIELS, Executor, vs. FOSTER and others.

EVIDENCE:   *Action by executor.—Defendant's testimony as to letter received by mail, purporting to be from the testator, during his life-time.*

1. In an action by an executor, the statute (ch. 176, Laws of 1868) only forbids defendant's testifying as to any transaction or communication had *personally* with the deceased.
2. Defendant's testimony that he had received by mail a certain letter purporting to be written by the testator before his decease, could not be directly contradicted by said testator, if living.

3. Such testimony (the letter being an essential part of the evidence on which the defense rested), was therefore admissible.
4. Defendant may also testify in such a case, that in his opinion (founded upon previous familiarity with the handwriting of the deceased) the letter is genuine.
5. The questions, how far the testimony of a party may be rejected merely on the ground of his interest, and what is the value of the testimony of experts in respect to handwriting, discussed per DIXON, C. J.

APPEAL from the Circuit Court for *Racine* County. The plaintiff brought suit as executor of the last will and testament of Charles R. Fox, deceased, to foreclose a mortgage made in March, 1858, by *John W. Foster* and *Maria M. Foster*, his wife, on two lots in the city of Racine, to secure the note of said *John W. Foster* for $2,100, at twelve months. *John W. Foster* set up, both by way of counterclaim and as payment, an account against the plaintiff for services, moneys advanced, etc., amounting to $3,176.78; and denied all indebtedness; and prayed for a judgment that the mortgage be discharged of record. Reply, in denial of the counterclaim.

The evidence given at the trial was very voluminous, and will not be stated here. It appeared that the mortgaged premises were the homestead of the mortgagors.

Two letters, purporting to have been written by Mr. Fox, and postmarked respectively at Adrian, Michigan, and Buffalo, New York, were put in evidence, *Mr.* and *Mrs. Foster* testifying that they received the letters by mail, and believed them to be genuine. This evidence was objected to by the plaintiff. The contents of the first, dated November 12, 1861, are sufficiently described in the opinion. The second, dated November 23, 1861, was as follows:

"FRIEND FOSTER:—Your favor has been this day received. You seem to feel some anxiety about the mortgage I hold against your place. I assure you, you need give yourself no uneasiness on that account, as I have made a discharge which I will forward to your good wife as I have always promised. I consider

that I have received pay in full by the services which you have done for me, besides the kindness and attention I have always received from your family, and always intended to, and will, make you compensation for the board of myself and Mrs. F. · In the meantime I wish you, as heretofore, to watch over my business in your place, and I will make it right.   With kind regards for yourself and family, and much love from myself and Mrs. F., I remain as ever,

.Yours truly,     CHAS. R. Fox."

The court found that said letter of November 23d was written and signed by said Fox, and by him forwarded to said *Foster*, November 25th, 1861, by mail; that the note and mortgage in suit had been fully paid by *Foster* in the manner set forth in said letter; and that the plaintiff, in good faith and without notice that his testator had ackowledged payment of the mortgage, had paid certain taxes and redemption money on the land, amounting, with interest, to $190; and it held the mortgage was not a lien upon the premises except for that sum; that plaintiff was entitled to recover judgment for said sum of $190, and to have the land sold to enforce his lien therefor; but that upon payment of said amount, defendants would be entitled to the relief demanded by them.   Judgment accordingly; and the plaintiff appealed.

*Fuller & Dyer*, for appellant, argued, among other things, that the testimony of *Mr. Foster*, so far as it related to transactions with Mr. Fox, was improperly admitted, citing Greenl. Ev., §§ 334, 338; 2 C. & H.'s Notes, p. 1555; 1 Hill, 63; 2 id. 181; 13 Pick. 445; 1 C. & P. 217; 16 Wis. 240.

*Paine & Millett* (with *Jas. G. Jenkins*, of counsel), for respondent, cited as to this point *Franklin v. Pinkney*, 18 Abb. 189, and 2 Robertson, 435.

DIXON, C. J.   The important point in this controversy is the genuineness of the letter of November 23,

1861. It is upon that the defense rests, for without it, none can be said to be completely, if at all, established. It is, therefore, the controlling question in the case, and the only one to be considered. It is a mere question of fact, and, aside from the discussion of some questions of law incidentally involved, the examination will be as brief as possible. The court below found that the letter was genuine, and we are inclined to sustain that conclusion. If the testimony of the principal defendant, *Dr. Foster*, and of his wife *Maria M.*, also a defendant, is admissible upon this issue, and their statements are to be considered as coming from persons competent to make them under the solemnities of an oath, then the decided weight of evidence is in favor of such genuineness. They testify, and particularly *Mrs. Foster*, directly to the fact of having received the letter by mail in the envelope postmarked Buffalo, November 25, 1861, the superscription of which is conceded to be the proper handwriting of Mr. Fox. The theory of the plaintiff is, that the letter which was enclosed and mailed in that envelope has been suppressed, and the letter in question substituted in its stead. This is charging the *Dr.* and *Mrs. Foster* not only with the crime of forgery against their deceased friend and his surviving relations, who were also their friends, but likewise with the still darker crime of perjury, committed on the trial of this cause. Against the previous good character and credibility of these parties, not one word of testimony was offered. No effort was made to impeach or to show them unworthy of credit, and the bill of exceptions discloses that they must have been well esteemed in the community where they resided as good and truthful citizens in the higher sphere of society. It is barely intimated against *Dr. Foster*, by some of the witnesses for the plaintiff, that he sometimes went too far in the service of his deceased friend Mr. Fox. As to *Mrs. Foster*, there is not an unfavorable allusion in the entire case. If, therefore,

these witnesses are to be discredited, and furthermore to rest under the imputation of having committed these great crimes, it must be mostly, if not altogether, upon the ground of their pecuniary interest in the result of this suit. It is hardly necessary for us to remark that no court or jury would set aside or wholly ignore their testimony on this ground. If they are competent to testify at all to the facts, the very law authorizing it implies that under such circumstances some faith and credit are to be given to their statements. No court or jury are authorized to say : " These parties are interested, and therefore, without .considering any other fact or circumstance, we will discredit them." Formerly interest disqualified, but now that policy is changed, and with the change came the rule that the testimony of ·such persons must be weighed and considered notwithstanding their interest, that circumstance being thrown into the balance against them, but not to overcome their statements, if, upon the whole, the fair and reasonable inclination of the mind is in favor.of their truth. If this were not so, it would be better that the former rule still prevailed ; for then, if the party gained no advantage from his own examination, he, at all events, escaped the imputation and odium of having given false testimony. The question comes back, therefore, whether it was competent for the *Dr.* and *Mrs. Foster* to testify that they received such a letter and in that envelope, and to give ·their opinion that it was genuine. The first part of this testimony borders very closely upon forbidden ground, if it does not quite reach it. It is difficult, upon this as upon many other questions, to determine just where the dividing line is. If, instead of the letter, it had been a written agreement or instrument releasing the mortgage, and executed or supposed to have been executed in the presence of the *Dr.* and *Mrs. Foster* and delivered to them, and controversy had arisen as to the genuineness of such agreement, or of Mr. Fox's signa-

ture thereto, it seems quite certain that the *Dr.* and *Mrs. Foster* could not have been permitted to testify directly to such signing, because it was a transaction to which Mr. Fox was an immediate party, and in which he acted, and it would have been competent for him, if living, to have denied their statements, or given explanatory or contradictory testimony. But here the question is different, and the circumstances somewhat peculiar. The defendants resided at Racine in this state, and Mr. Fox at Buffalo, New York. The letter was written and mailed at Buffalo, addressed to the defendants at Racine, and received by them at that place. The question is, whether, after the death of the writer, it is competent for the party who receives a letter at a distant place to which it is adressed, to testify to such receipt. The deceased party could not, from the nature of the transaction, have made any directly contradictory statement. He was a party to the transaction, but not an immediate party, at least to that part of it concerning which the proof is offered. The fact to be proved is not one of which he had any positive knowledge, or which he could, if living, have positively denied. He could deny it indirectly or by inference only, by denying that he ever wrote the letter. But this would be testimony to another fact or point, as to which it is not proposed to examine the living party, and of which he has no positive knowledge. It is in the nature of circumstantial evidence so far as the testimony of the living party goes; and the question is, whether he can testify to a circumstance transpiring in the absence of the deceased, and of which the deceased had no knowledge and could not disprove, except by denying the principal fact which the circumstance tended to prove, or by testifying to some other distinct fact or circumstance which would have an opposing or contradictory tendency and effect. The statute forbids the examination of a party, in his own behalf, in respect to any

transaction or communication had *personally* by such party with a deceased person, against parties who are executors, administrators, etc., of the deceased.   Laws of 1868, ch. 176.   The case does not seem to come within the letter of the statute, and yet the communication was in some sense personal.   But the personal transaction or communication of the statute, no doubt, means a transaction or communication face to face, or by the parties in the actual presence and hearing of each other.   In every such case the statute excludes the testimony of the living party, upon the obviously wise and just ground that his adversary, whose cause of action or defense survives, and who was possessed of equal knowledge, and was equally capable of testifying to what the transaction or communication really was, has been removed by death, and so cannot confront the survivor, or give his version of the affair, or expose the omissions, mistakes, or perhaps falsehoods of such survivor.   The temptation to falsehood and concealment, in such cases, is considered too great to allow the surviving party to testify in his own behalf.   The law has, therefore, wisely excluded him.   But this reason for the exclusion is not applicable to the present case, at least not fully applicable.   Could we know that Mr. Fox, if living, would testify that he never wrote the letter in question—that it was a forgery—then indeed there would seem to be strong reason for excluding the testimony. But we do not and cannot know this, and it is only by assuming the supposititious character of the letter, and that Mr. Fox would have so testified, that any appearance of hardship exists.   Had Mr. Fox survived, this controversy might never have arisen.   He might have acknowledged the genuineness of the letter, which is now the subject of such doubt and conflict of opinion, and might have freely forwarded the discharge therein spoken of.   We cannot say what he would have said or done respecting this now perplexing question,

and cannot indulge in any presumption either way, which shall influence its determination. The statute does not, unless by an interpretation obviously more liberal than its language and the plain intent of the legislature will admit, exclude the testimony of these defendants; and so we must hold that it was admissible, and must be considered upon the question under consideration.

The other objection, namely, that it was incompetent for the same witnesses to state their opinion that the letter was genuine, is less difficult. This was clearly not a matter within the prohibition of the statute. It was not a transaction or communication had personally with the deceased, but an opinion founded on knowledge and experience derived from long correspondence with him and familiarity with his handwriting.

Considering the testimony of these parties, therefore, we think the preponderance of evidence sustains the genuineness of the letter. Their testimony seems truthful. It was given with fairness and candor, and we are impressed with the idea that it is true. There is much in the case to corroborate and nothing to discredit it, save only the testimony of the opposing witnesses on the subject of the handwriting. This latter is matter of mere opinion. It is the opinion of witnesses to aid or influence the opinion of the court or jury. The unsatisfactory nature of such evidence is well known. The facility with which great numbers of witnesses may be marshalled on both sides of such a question, all calling themselves experts, and each anxious to display his skill and ingenuity in detecting the false or pointing out the true, and equally honest and confident that his own theory or opinion is the only correct one, and yet all on one side directly opposing all on the other, admonishes us of the fallibility of such testimony, and of the great degree of allowance with which it

must be received. In the famous *Howland Will Case*, recently tried in Massachusetts, the ablest experts in this country were examined, and the utmost resources of modern science exhausted upon a question of this kind, but with no more satisfactory result than usually attends such examinations. There was the same conflict of opinion, the same war of experts. Either side was able to match the other in numbers, skill and ability. The report justifies the remarks of an able and learned writer, who, speaking of the experts and scientific men examined, some of whom had spent months in labor and preparation, says: " They stand ranged on the one side and on the other, differing from and contradicting one another, not only on the main question of the forgery, but in a thousand more minute but still important particulars, equally confident of adverse opinions, until the brain of the unprejudiced reader of this mass of conflicting opinions swims with confusion, and he asks with 'jesting Pilate,' What is truth ? Thus the result of so much labor of experts—their skill, their ingenuity, their patience, their anxiety, simply demonstrates to the profession their inutility in a court of justice." Am. Law Review, vol. 4, p. 643. The case before us is not such a marvel of conflicts and contradictions as that just referred to. But few witnesses were examined on either side, perhaps one or two more for the plaintiff than for the defendants, and of course they directly contradicted each other. The testimony of one trustworthy witness to a fact, such as the receipt of the letter by *Mrs. Foster* in the envelope conceded to have been superscribed by Mr. Fox and postmarked at Buffalo, is of more value than that of many such witnesses, whose opinions, after reading the opposing testimony of other equally credible persons, can hardly be said to be worth anything. They certainly cannot turn the scale of credibility against *Mrs. Foster*,

deeply interested though she may be in the result of the litigation.

But, as has already been said, the testimony of these parties is strongly corroborated by other proofs in the case. The letter of November 12th, 1861, is admitted to be genuine. Both that letter and the letter of November 23d were written while *Dr. Foster* was very sick. It was supposed that he would not recover. In the letter of November 12th, Mr. Fox said, among other things: "Tell the Doct. not to give up; *all will be right about the homestead, as I have always promised you,* and I hope for the best in the settlement of his other matters." The mortgage in question was upon the homestead, and it was that which was to deprive *Mrs. Foster* of it, if she lost it in the event of her husband's death. It is argued that Mr. Fox intended no more by the language than that, in the event of the Doctor's death, he would not press payment of the mortgage, or proceed to an immediate foreclosure. This does not satisfy the language, nor come up to the spirit and intent of the writer. It would be a strange way to make " all * * right about the homestead," to hold a mortgage over it by which its value was destroyed and the title of the occupant liable to be swept away at any moment. We cannot believe that this was what Mr. Fox meant when he said " all will be right about the homestead, as I have always promised you." The evidence discloses the intimate and confidential relations existing between the parties. It shows also that Mr. Fox was indebted, or under great obligations, to *Dr. Foster* for past services, and was obliged both to him and to *Mrs. Foster* for very many acts of kindness, hospitality and attention. He no doubt remembered and intended to reward them for these, and had promised to do so by discharging the mortgage, which was the only thing that would make " all * * right about the homestead," in the language of the letter. It was to this promise, we think, reference was made,

which is the same promise repeated and made more explicit in the letter of November 23d.    In the latter he stated the consideration for what he again said " I have always promised,"—a consideration which the evidence in this case clearly shows to have existed.    He likewise stated what the promise was, and that promise was in harmony with what was said in the letter of November 12th.    We think the letter of November 23d bears the impress of truth on its face, and by its style and contents gives evidence of its own genuineness.    We think it was written by the same person who wrote the letter of ·November 12th, and this conviction is so strong that it would require clear proof of forgery to overcome it.    Judging from the contents of the letter of November 12th, according to the only interpretation we can give, and from all we know of this case and of the situation and relations of the parties, it seems to us to be just such a letter as, under the circumstances, Mr. Fox would have written.    On the other hand, if a forgery, it was certainly a very clever one, and more clever than we can suppose to have taken place by the hands or at the instigation of parties never before engaged or suspected of being engaged in the perpetration of the same or of any kindred offense.    If written years after by these defendants, or by some one for them, it is certainly very remarkable that it should have occurred to the writer to add a request that *Dr. Foster* should still continue to watch over Mr. Fox's business at Racine. An adept or experienced offender in the commission of the crime might have thought of this, but it is hardly probable that *Dr. Foster* or his wife would.

The views thus expressed are decisive of this case, and it follows that the judgment of the circuit court must be affirmed.

*By the Court.*—Judgment affirmed.