IMPERIAL APPLIANCE CORPORA·
TION and Thomas J. Linane,
Plaintiffs,

v.

HAMILTON MANUFACTURING COM·
PANY, Defendant.

No. 63–C–291.

United States District Court
E. D. Wisconsin.

Jan. 19, 1968.

Paul R. Puerner, of Michael, Best & Friedrich, Milwaukee, Wis., and Eugene C. Knoblock, South Bend, Ind., for plaintiffs.

A. F. Rankin, Manitowoc, Wis., and L. C. Noyes and Arlie O. Boswell, Jr., Chicago, Ill., for defendant.

## DECISION

GRUBB, Senior District Judge.

This action for breach of contract is before the court on trial solely of the preliminary issue of interpretation of the agreement which relates to royalty payments under a license of patented invention covering clothes drying machines manufactured and sold by defendant.[1]

Imperial Appliance Corporation ("Imperial") as licensor, and Hamilton Manufacturing Company ("Hamilton") as licensee, operated under the agreement in issue, entitled "Contract and License," dated November 29, 1941, as amended by a three-party agreement among them and the patent owner, Stanley G. Harwood, until September 1962, when Hamilton, deeming the contract terminated by its own provisions, discontinued payments of royalties.

Imperial contends that under the Contract and License, Hamilton has the further obligation to pay royalties in respect to and for the life of purported improvements on the subject matter of the license allegedly being utilized by Hamilton in the manufacture and sale of clothes dryers. The improvement is claimed to lie in U.S. Letters Patent No. 2,540,955 issued in 1951 on application of J. R. Moore, the inventor, filed in 1945, and held by Hamilton, as assignee. This patent will expire in February 1968.

The Imperial-Hamilton license of the Contract and License is, in fact, a sublicense of the subject matter under an exclusive license Imperial held from the patent owner since 1938. Prior to execution of the Contract and License, Imperial and Hamilton had operated under a manufacturing contract whereunder Imperial had retained its license rights to sell and to direct profits on sales of dryers embodying the invention that were manufactured by Hamilton. The parties found it expedient in 1941 to transfer Imperial's selling right to Hamilton. Accordingly, the patent owner and Imperial amended the 1938 license grant by an agreement hereinafter referred to as the "New Harwood Imperial Agreement" and Imperial and Hamilton executed the Contract and License in issue to accomplish this objective.

Under the original 1938 license, Imperial was granted the exclusive right to manufacture and sell clothes dryers embodying the invention disclosed in United States applications for letters patent, serial numbers 177,123 and 236,189, until the date of expiration of the last letters patent to expire covering the clothes dryers. The 1938 license was amended on August 14, 1939, to also include Candian application serial number 462,022, filed by J. R. Moore, for clothes drying machines.

The New Harwood Imperial Agreement, dated November 27, 1941, further amends and incorporates as amended the 1938 license. By this agreement, the license is enlarged to include any and all improvements of the dryers or in the process of their manufacture made by or at the instance of either Imperial or Hamilton, which were understood to be and to remain the property of Harwood. The term of the license was extended to run for the full life of the patents issued and to be issued on the designated applications and of any and all improvements thereto.

The New Harwood Imperial Agreement further provides a schedule of royalty rates for as long as said agreement was to remain operative, which were to be paid to Harwood directly by Hamilton whose agreement thereto Imperial was to obtain in the contemplated contract of sublicense. The term of the New Harwood Imperial Agreement, setting forth the amended 1938 license,

---

1. For prior decisions in this case see, Imperial Appliance Corporation v. Hamilton Manufacturing Company, 239 F.Supp. 175 (E.D.Wis.1965), and Imperial Appliance Corporation v. Hamilton Manufacturing Company, 263 F.Supp. 1015 (E.D.Wis.1967).

was to commence on January 1, 1942, and to extend thereafter "throughout the life of said patents applied for or issued." Since the only applications for patents pending at the time of the execution of this agreement were those specified by number, the phrase "the life of said patents applied for or issued," necessarily has reference only to the life of the patents issuing on said applications. Thus it appears that while the term of the Harwood-Imperial license extends for the life of the patented invention and improvements thereto, the term of the license-royalty payment agreement between Harwood and Imperial extends only for the life of patents issuing on the designated applications.

The Contract and License between Imperial and Hamilton identifies, incorporates for reference, and has attached to it the New Harwood Imperial Agreement embodying the Harwood Imperial license. It identifies certain subject matter as the "Moore Patents" which are defined as consisting of applications for United States Letters Patent covering Clothes Drying Machines, serial numbers 177,123 and 236,186 and Canadian application serial number 462,022, and as including any and all letters patent of the United States and Canada which may result from or be granted on said applications.

The Contract and License recites that it was intended to embody such provisions as were necessary to enable Imperial to carry out the New Harwood Imperial Agreement. Hamilton agreed to pay total royalties on its sales of dryers to Imperial and to Harwood for the account of Imperial according to specified schedules and acknowledged that any and all improvements of the dryers or in the process of manufacturing the same were understood to be and remain the property of Harwood and further, that the Harwood-Imperial license was to extend for the full term of the patents issued or to be issued and any and all improvements thereto.

The scope and term of the sublicense granted under the Contract and License are specified in paragraph 2 of Part IV of the instrument. This reads as follows:

"For the considerations hereinbefore recited, Imperial as Licensor hereby gives and grants to Hamilton as Licensee, the sole and exclusive right to manufacture, use and sell *Dryers embodying or made in accordance with the inventions described and claimed in the Moore Patents,* throughout the entire territory of the United States and its dependencies and also the entire territory of Canada, *the rights hereby granted to the Licensee to continue from January 1, 1942, to the date of the expiration of the last Letters Patent to expire covering said Dryers,* unless this sub-license becomes cancelled or terminated, prior to such final expiration of patents, under any of the provisions of this agreement; * * *" [Emphasis added.]

Hamilton had the right of unilateral withdrawal from the contract on thirty days' notice to Imperial with the requirement that it would reassign to Imperial all its rights under the agreement. Pursuant to the 1945 amendment of the Contract and License, Hamilton was also required to serve notice of withdrawal on Harwood, the patent owner.

Comparison of the Harwood-Imperial license and the Imperial-Hamilton sublicense discloses that the scope and terms of the respective grants and the corresponding obligations to pay royalties are not coextensive. The Harwood-Imperial license covers the Moore Patents as that term is used in the Contract and License, that is patents applied for or issued on the three specified applications, as well as improvements thereto. However, Imperial's obligation to pay specified royalties to Harwood terminates on the date of expiration of the last patent to be issued on the named applications.

The Imperial-Hamilton sublicense, although the parties thereto acknowledge that ownership and the Harwood-Imperial license cover improvements to the Moore Patents, relates only to the Moore

Patents and Hamilton's obligation to pay royalties to Harwood on its own and on Imperial's account runs only for the life of the patents that issued on the named applications.

Thus it appears from the language of the respective agreements that Imperial granted Hamilton less than its own total interest in the invention relating to clothes dryers and further that the obligations of Imperial and of Hamilton to pay royalties under the license and sublicense would terminate on the date of expiration of the last patent to issue on the named applications which event occurred on September 18, 1962. It was this discrepancy between the term and scope of the respective grants and royalty payment obligations that underlay this court's denial of defendant's previous motion for summary judgment to permit further consideration of the intention of the parties to the agreements in this respect.

Plaintiffs point to various provisions of the Contract and License as showing that, contrary to the express agreements concerning scope and term, the parties intended the sublicense and royalty payment provision to cover not only the Moore Patents but also improvements thereto. However, the recital that the Contract and License was intended to enable Imperial to perform its obligations under its license from Harwood and the specification of royalty payment schedules in the New Harwood Imperial Agreement for as long as the terms and provisions of that agreement remained operative do not indicate such an intention. Harwood's and Imperial's rights as owner and licensee, respectively, of the improvements are safeguarded by acknowledgment of their interests and the veto power of Imperial over Hamilton's utilization of improvements. And under the New Harwood Imperial Agreement, Imperial, notwithstanding its license in improvements, has no obligation to pay any royalties after date of expiration of the last patent to issue on the named Moore Patent applications.

After careful study of all of the provisions of the Contract and License, viewed in light of the terms of the New Harwood Imperial Agreement, the court is of the opinion that neither the plain language of the pertinent instruments nor its reasonable implications grant Hamilton any right to use of improvements or create a contractual obligation on Hamilton's part to pay royalties in respect to improvements that were not within the scope of its sublicense under Imperial. The court cannot assume that the attorneys who drafted the controlling agreements or signed them on behalf of the party as in the case of Imperial,[2] intended to but inadvertently neglected to give expression to extension of the sublicense and royalty payment obligation to include improvements even though ownership and exclusive Harwood-Imperial license of such improvements is expressly stated. As far as the record in this action indicates, no improvements were being developed or in existence at the time the controlling agreements were executed in November of 1941. Under the circumstances it may reasonably be thought that Harwood, Imperial and Hamilton deferred negotiations as to a sublicense of improvements and the obligation to pay royalties thereon to abide the event of the development or invention of such improvements.

Plaintiffs further rely on a memorandum of discussions between Imperial by its president Thomas Linane and Hamilton by its vice president Howell Evans, since deceased, to show that the parties understood the sublicense to extend to improvements on the Moore Patents. According to Linane, the memorandum was attached to a letter, dated March 6, 1944, which he received from Evans. The letter refers

2. There can be little force to the contention that the Contract and License should be construed against the drafter Hamilton under the circumstances of this case since Linane, Imperial's president, was an attorney and had prior experience in the drafting of license agreements.

**360**

to the memorandum and its subject matter. The item may be deemed sufficiently authenticated to qualify as a writing outside the bar of the Wisconsin deadman's statute.[3]

In the memorandum it is envisioned that Hamilton's proposal to lower royalties would permit research and "further" improvements and "thus return to all licensors greater and almost permanent remuneration." The expectation of almost permanent remuneration appears to be somewhat optimistic salesmanship to persuade the parties to agree to the lowering of revenues from the sublicense. After all, even Imperial's construction of the agreement as covering a sublicense of improvements would only extend the life of the contract for an additional six years to the date of expiration of the purported improvement patent. However, under the prevailing agreements as construed by Hamilton, the licensors Harwood and Imperial were bound to profit by improvements since they were owner and exclusive licensee thereof. The record does not disclose whether Hamilton also was a licensor although it was authorized to sublicense others. Nor does the evidence disclose whether or not prior improvements had been made and were being utilized by Hamilton to explain the use of the words "further improvements." Of course, Hamilton could share in the anticipated benefits, provided, however, that the parties negotiated a sublicense and royalty contract covering improvements.

Finally, plaintiffs rely on Hamilton's letter of notice of termination as indicating Hamilton's understanding that it was withdrawing unilaterally from the Contract and License, and claim that Hamilton breached its obligation to reassign Imperial's rights in the purported improvements. The tenor of the letter from Hamilton clearly expresses its position that it considered the Contract and License terminated by its own provisions and that the advance notice was an act of courtesy not a partial compliance with the unilateral withdrawal provision of the agreement. Since Hamilton had no rights under the Contract and License in improvements to the Moore Patents, it had no contractual obligation to reassign.

■■ Plaintiffs have failed to produce convincing evidence to establish that the parties understood the Contract and License to extend to improvements on the Moore Patents contrary to the import of the language of the pertinent agreements. Accordingly, the court finds that the Contract and License grants Hamilton a sublicense covering the Moore Patents as defined in that agreement, and that said sublicense does not extend to improvements to the Moore Patents and creates no obligation to pay royalties in respect to dryers embodying or manufactured in accordance with such improvements.

Assuming for purposes of this decision that Patent No. 2,540,955 discloses improvements to the Moore Patents, and assuming further that Hamilton has been and is now utilizing the purported improvements in the manufacture and sale of clothes dryers, the use would be in derogation of Harwood's and Imperial's rights to improvements that Hamilton acknowledged in the Contract and License. However, plaintiffs' remedy for the unauthorized use does not lie in an action based on breach of the royalty payment or unilateral termination provisions of the Contract and License as alleged in the Complaint herein.

The foregoing decision sets forth the court's findings of fact and conclusions of law in accordance with the provisions of Rule 52 of the Federal Rules of Civil Procedure. Counsel for defendant is hereby directed to prepare an order for judgment on the issue of construction of the agreement in accordance with this decision and to submit the same to counsel for plaintiffs for approval as to form only.

---

3. Wis.Stat. § 885.16. See, Wisconsin Civil Trial Evidence, § 1.643(2); Daniels v. Foster, 26 Wis. 686, 692 (1870).