CAPOLA M. HOYT *vs.* INSURANCE COMPANY OF NORTH AMERICA.

SAME *vs.* NORWICH UNION FIRE INSURANCE SOCIETY OF ENGLAND.

Somerset.     Opinion December 17, 1907.

*Fire Insurance.     Verdict.     Same will be set aside, when.*

Where a plaintiff has recovered a verdict which is manifestly against the weight of evidence, it will not be permitted to stand but will be set aside.

In the case at bar, the plaintiff's hotel property and contents were destroyed by fire. At the time of the loss there was $3000 insurance upon the property, divided equally among three companies two of which were the defendants. One company adjusted its loss, but the two defendants refused to pay and thereupon the plaintiff brought suits against them. The two actions were tried together, and a verdict for $600 against each defendant was returned. It was chiefly contended in defense that the property was very largely over insured and that the plaintiff procured one Reed to burn the same. *Held:* That the verdicts were so manifestly against the weight of evidence that they must be set aside.

On motions by defendants.     Sustained.

Two actions of assumpsit, one against each defendant, brought upon fire insurance policies issued by the defendants on the same property which was destroyed by fire June 14, 1905. Plea, in each action, the general issue with brief statement, substantially the same in each case, as follows: "And for brief statement of special matter of defence to be used under the general issue pleaded, the said defendant further say: First: That the plaintiff is not entitled to recover on said policy declared upon, because she attempted to defraud the defendant company by procuring one Otis Reed to burn the property covered by the policy declared upon in this action.

"Second: The policy declared upon is void because the plaintiff the insured, afterwards made or placed other insurance on said property without the assent in writing or in print of the company, which additional insurance was outstanding at the time of the

loss, contrary to the terms, conditions and provisions of said policy declared upon.

"Third : The defendant says that the plaintiff did not, forthwith after the loss, render to the defendant company, a statement in writing signed and sworn to by the insured, setting forth the value of the property insured and the manner in which the fire originated.

"Fourth : Because the entire loss did not exceed twelve hundred dollars.

"Fifth : That the plaintiff never gave the defendant company any legal notice and proof of the loss.

"Sixth : That the plaintiff fraudulently over-valued the property lost."

The plaintiff also filed in each action a counter brief statement, substantially the same in each case, as follows :

"And now comes the plaintiff, and in reply to the brief statement of special matter of defence pleaded by the said defendant, the plaintiff further says ;

"First. That she did not attempt to defraud the defendant company by procuring one Otis Reed to burn the property covered by the policy declared upon in this action.

"Second. That the said defendant knew when other insurance was placed upon the said property and that it waived the requirement that the assent of the said defendant, to such other insurance, should be expressed in writing or in print upon said policy ; that there were three policies of insurance upon the same property at the time of the fire, in three different companies, and that S. E. Remick was the duly accredited agent of each of the three companies, and that each of the three companies was bound by his knowledge of existing insurance or other insurance afterwards put on by him.

"Third. That the plaintiff did submit a statement in writing to the said defendant company, signed and sworn to by her, setting forth the value of the property insured, and the manner in which the fire originated, as far as she knew, and that said statement was submitted forthwith after the fire, or that the defendant expressly waived in writing the furnishing of such statement by the plaintiff.

"Fourth. That the entire loss exceeded three thousand dollars, the total amount of insurance on said property.

"Fifth. That she did give the defendant legal notice and proof of the loss.

"Sixth. That she did not fraudulently overvalue the property lost."

These two actions were tried together at the September term, 1906, of the Supreme Judicial Court, Somerset County. Verdict for plaintiff for $600 in each action. Each defendant then filed a motion substantially the same in each case, to have the verdict against it set aside for the following reasons :

"1st. Because it is against the evidence.

"2nd. Because it is manifestly against the weight of evidence.

"3rd. Because it is against the law.

"4th. Because the damages were not assessed in the manner directed by the court or under the terms and conditions of the policy or as the law provides.

"5th. Because the attorney for the plaintiff wrongfully and unlawfully argued to the jury the question of the acquittal of the plaintiff at a former trial upon a charge that she conspired to burn the same buildings and that said case was tried upon the same evidence as the civil suit, and urged them to take that matter into consideration in the determination of the issue before them in this case, although no evidence whatever was put into the case as to her acquittal or as to what evidence was introduced at the former trial. All of which was very detrimental to the rights of the defendant company.

"6th. Because the verdict in the light of all the evidence introduced in the case and the law as clearly enunciated by the presiding Justice is so manifestly wrong that it is evident that the jury acted under bias and prejudice against this defendant simply because it is a corporation."

The case fully appears in the opinion.

*Forrest Goodwin*, for plaintiff.

*Merrill & Merrill*, for defendants.

SITTING : EMERY, C. J., WHITEHOUSE, STROUT, PEABODY, KING, JJ.

KING, J.   The plaintiff's hotel property and contents, situated in the village of West New Portland, Maine, were destroyed by fire on the 14th of June, 1905.   At the time there was $3000 insurance upon the property, divided equally among three companies.   One company adjusted its loss.   These actions, against the other two companies, were tried together and a verdict of $600 against each company returned, which the defendants move to have set aside. It was chiefly contended in defense that the property was very largely overinsured and that the plaintiff procured one Otis A. Reed to burn it.

In May 1904, the plaintiff, a young divorced woman, moved with her mother from Mechanic Falls to Wilton in this State, where they remained for a few weeks only.   During that brief stay in Wilton the plaintiff formed an intimate acquaintance with Otis A. Reed, an overseer in the woolen mill, having a wife and two children, with whom, however, he was not living.   On May 28, 1904, the plaintiff purchased for $450 the property in question, and with Reed and her mother moved there about the first of June.

The condition of the property was very poor and repairs were begun.   The first policy of insurance for $1000 was written July 22, 1904, through the agency of S. E. Remick, who solicited the business, and suggested that he would write more when the repairs were completed.   The plaintiff claims that she expended in repairs and furnishings, "somewhere about $3000."   On the other hand the defendants contend that she did not in fact expend one third of that sum.   The character, extent and cost of the repairs actually made, the plaintiff's claims in relation thereto, and the testimony in her behalf in support of those claims, are important because of the light they reflect upon the other vital contention that she procured Reed to burn the property "for the insurance."

No detailed or other satisfactory account of her expenditures was given by the plaintiff.   She claimed to have no such account, and no receipts, with few exceptions.   But she asserted that she and her

mother had about $3000 in money, all of which she expended upon the property, in addition to the purchase price.

It appears that just before the plaintiff and her mother left Mechanic Falls for Wilton, the mother sold her home for $1000; that there were incumbrances upon it of about $450 which were paid at the time; that the plaintiff had about $900 of her own money; that on the way from Mechanic Falls to Wilton they deposited in a bank in Lewiston $650 of the mother's money, and "$700 or $800" of the plaintiff's; that the plaintiff afterwards drew from the bank the $450 with which to pay for the property in question. But the mother testified, in support of the plaintiff's claim that they had $3000 which was expended upon the property, that before she sold her home she had $1500 in cash. She says: "I had it, part of it mine and part my sister willed me when she died." After admitting on cross examination that no will was probated, and no inventory filed, she stated: "There was nothing only she had the will made out and I got it sealed and signed. She said she owed nobody and nobody owed her and nobody knew she had this money, and it was mine for taking care of her, and I have got the will that shows it." In answer to her counsel afterwards she said that her sister before her death handed her a package of money containing about a thousand dollars. She further testified that another daughter, who with her husband had conveyed the home to her subject to the incumbrances, sent her the $450 at the time of the sale, with which the incumbrances were paid, and, therefore, that she had $2500 in cash when she left Wilton, only $650 of which was deposited in the bank, and the balance of $1850 she kept on her person. "I kept it with me, round my person. I had it in a belt." Thus they account for "somewhere about $3000" claimed to have been expended.

The defendant companies, on the other hand, appear to have made an exhaustive effort to procure from workmen employed, material men, and other dealers of whom the plaintiff claimed to have made purchases, evidence of the expenditures which the plaintiff in fact made. And it is claimed that the amount so accounted for at the trial is $401.57 for repairs to the buildings and $352.84 for furnishings.

It will serve no useful purpose to incorporate here an analysis of the voluminous evidence contained in the record relative to this question.   We have examined that evidence with care and it satisfies us that the testimony offered to support the plaintiff's claim that she expended "somewhere about $3000" in repairing and furnishing that property is unreasonable, and unbelievable, when squared with the established facts and circumstances of the case.

It is unreasonable that any one would expend $3000 on property so situated, costing but $450, and with no business whatever to warrant it; unreasonable that the mother acquired the $2500 in the way she claims; unreasonable and unbelievable that when she deposited $650 in the bank for safe keeping she still had $1850 in cash on her person "in a belt," and took it with her among strangers for an indefinite stay, and with no purpose for its immediate use.   If the mother had this sum of $1850 in cash on her person, which the plaintiff freely and wholly expended afterwards on this property, why was the $450 drawn from the bank to pay for the property?

The conclusion is irresistible that the amount deposited in the bank (about $1400) was substantially all the money the plaintiff and her mother had at the time, from which the price for the property was paid, leaving a balance practically equal to the amount of the expenditures accounted for; that the plaintiff's claim of $3000 expended was at least unjustifiable, and that her testimony and that of her mother in support of that claim is not credible.

We come now to the real vital question in these cases.   Did the plaintiff procure Otis A. Reed to burn the property in question that she might obtain the insurance?   Reed confessed the crime.   He was called as a witness for the defense and testified that he committed the act for the plaintiff and at her request made of him at a room in the Atwood Hotel in Lewiston on the night of June 8, 1905.

In order to perceive to what extent Reed's testimony is corroborated by unquestioned facts and circumstances, and on the other hand to recognize the utter weakness and irreconcilability of the plaintiff's attempted answer to that testimony, it is necessary to point out briefly the relations between the plaintiff and Reed and their conduct down to the time when the plot was completed at the

Atwood Hotel, and also from that time to the time of the trial.

Reed continued to live with the plaintiff and her mother from the time they moved to the property until the last of February, 1905. He assisted in making the repairs and did the chores, receiving no compensation except his board. The last of February, 1905, he went back to Wilton to work. He and the plaintiff corresponded two or three times a week, and she admits that such terms as "Dear Otis" and "Lovingly Cappie" were used by her in this correspondence. He came back in March and remained over night. On May 7, 1905 the plaintiff wrote Mr. Remick, the insurance agent, that she was ready to have more insurance put on her place. On May 10, 1905 the other two policies of $1000 each were written. There is no evidence that any hotel business was carried on at the property. On June 7 the plaintiff sent a letter by special delivery to Reed at Wilton, requesting him to meet her the next day on the train at Leeds Junction. On the 8th, the plaintiff and her mother left West New Portland, each taking a trunk, leaving no one in the house. The mother went to Strong to visit a son and the plaintiff started for Boston. Reed met the plaintiff on the train at Leeds Junction according to appointment. They went to Lewiston, took a hack to the Atwood Hotel, where Reed registered as "F. H. Jones & wife, Madison, Me.," and procured a room to which they both went. They took supper together at a restaurant, attended the theatre in the evening and returned to the room. Reed says that he remained in the room all night. The plaintiff says he left the room about half past twelve. No other room was assigned to him. In the morning they took breakfast together, went together to the railroad station, and she took the early train for Boston. Reed says that the plaintiff asked him that night in that room if he would burn the buildings so that she could get the insurance, and that she promised when she got the insurance to go to Massachusetts with him and marry him after he got a divorce from his wife. That she gave him the key to the house, told him where to find the kerosene, and wanted him to do the act on Tuesday night.

On the following Wednesday night June 14, (it rained on Tuesday) Reed rode on his bicycle from Wilton to West New Portland

reaching there about midnight and fired the property. He was arrested before he got back to Wilton and committed to jail. The key to the front door of the burned house was found in his pocket. At first he denied all knowledge of the fire, but afterwards, July 29th, made his confession.

On Wednesday night, the 14th of June, the very night that Reed fired the buildings, the plaintiff wrote Reed the following significant letter.

"Dear Otis,—

"I hope everything is all over I have not heard let me know.

"And send me $15.00 sure I have not got only 25c I had the doctor and it took all my money and I half to pay for what I eat so you see I cant get back and I owe Leata seven dollars I borrowed for medison the doctor thinks he can cure me if I can stay under his treatment and I can if I get money.

"This is Wed. night and you will get this Thursday and be sure and send money so I can have it Friday night send it special delivery then I will get it all right Fri. now be sure and get it for me for I must have it.

"If you have not done it yet do as soon as possible You may wait until Sat. night if you rather, but be sure and send me the $15.00 for I cant get along without it any way for Leata needs hers awfully.

"Now don't disappoint me on anything for I am all in

"Lovingly

"Capola Kershner

"Room 15                                "Endicott Bldg.

"Care of L. B. Norton"                    "Beverly, Mass."

This letter did not reach Reed before his arrest. It was afterwards discovered and disclosed in defense.

The plaintiff was notified of the fire by wire and returned from Boston on Saturday, the 17th, when she was informed of Reed's arrest.

On the 27th of the same month the plaintiff married Hastings Hoyt, a young man of West New Portland, to whom she was engaged to be married before leaving for Boston. On the day fol-

lowing the marriage the plaintiff visited Reed at the jail in company with Reed's attorney, who was her attorney afterwards at least. She shook hands with Reed and told him that she was sorry he was there.   At that visit a private interview was sought between the plaintiff, Reed and the attorney, which the sheriff did not permit. Reed's confession had not then been made.

On the 6th or 7th of July George E. Macomber, representing the three insurance companies, visited the plaintiff and talked with her concerning the fire.   Mr. Macomber testified that he asked her if she stopped in Lewiston on the way to Boston and that she said no.

"I asked her if she had any theory, asked her if she knew that Mr. Reed or anybody had been arrested for setting the fire.   She said that she had heard that he had been.   I asked her if she thought it was true that he set the fire.   She said she did not, did not believe it could be possible.   I inquired of her if there was any motive for Mr. Reed to set the fire.   She said there was not, they never had had any trouble and got along nicely together."

The plaintiff denies that Mr. Macomber made such inquiries of her or that she made any such statements to him, but admits the interview.

Excepting only the pith of Reed's confession — that she procured him to burn the property — the plaintiff is forced to admit as true all the false, treacherous, and dishonorable conduct and acts on her part as disclosed by the confession.   It is significant to note, however, that she admitted none of these acts and circumstances before the confession, but, according to the testimony of Mr. Macomber, denied some of them.

She claims now that Reed was her enemy and committed the crime from motives of revenge.   She testified that he was angry because of Hoyt's attentions to her ; that long before he left the house at all he had made threats to shoot her, and to burn her and Hoyt in the buildings if they were married and lived there ; that she arranged the meeting in Lewiston in order to induce Reed to cease annoying them, and that the conversation there "was about my engagement and his divorce that he wanted to get from his wife, and he promised

to leave the State if I would help him get the divorce, and let us alone." She says that he agreed to consult a lawyer on Tuesday night about the divorce; and she explains the expressions in her letter to him of the 14th, "I hope everything is all over I have not heard let me know," and "If you have not done it yet do as soon as possible You may wait till Sat night if you rather," as referring to his interview with the lawyer about the divorce.

These statements of hers are so improbable, unreasonable, and utterly irreconcilable with her conduct and admitted relations with Reed that they intensify the conviction of the truth of Reed's testimony beyond a reasonable doubt. It is most incredible that Reed had repeatedly threatened her life "long before he left the house at all" when she is forced to admit that after he went away she wrote him loving and endearing letters two or three times a week; that she arranged to meet him at the hotel in Lewiston; that she wrote the letter from Beverly June 14th; that she visited him at the jail and expressed her sympathy for him; that she told Macomber they never had any trouble and she could not believe he did it; and that not until the confession did she make known to any one, even to Hoyt, that any such threats were ever made.

It is to be noted that the plaintiff's testimony is that Reed only threatened to do personal injury to her and Hoyt. She would not admit on cross examination that Reed ever said he would burn the buildings but only that he threatened to burn them in the buildings.

"A. No, sir; he didn't threaten to burn my buildings; he threatened to burn us if we were ever married.

"Q. I thought that you said he threatened to burn your buildings?

"A. He threatened to burn us in the buildings if we were married and lived there." According to her own testimony Reed's act could not have been done to carry out any of these threats, because he knew the act could result in no personal injury to either of them as they were not in the house, and it could not well result in financial loss to her in view of the fact that the property was over-insured as the record clearly shows.

Reed burned the property.   He says the plaintiff procured him to do it.  He had no other reason or motive to do it.   The evidence unmistakably establishes the truth of his statement.   It is the opinion of the court that the verdicts are so manifestly against the weight of the evidence that they should not be permitted to stand.   The entry in each case must be,

*Motion sustained.*