In re BURG.

(District Court, N. D. Texas, Dallas Division. August 13, 1917.)

No. 1345.

1. BANKRUPTCY ⊂⇒77—FILING PETITION—NUMBER OF CREDITORS.

Relative to right, under Bankr. Act July 1, 1898, c. 541, 30 Stat. 544, of a single creditor for $500 to file petition to have the debtor adjudged bankrupt, permissible if there be less than 12 creditors, holders of small claims for household supplies, payable monthly, will be disregarded, under the maxim of de minimis.

2. FRAUD ⊂⇒59(1)—FRAUD OF PRINCIPAL—MEASURE OF DAMAGES.

The only complaint of one employed to sell as agent on commission a particular machine being that it did not come up to the representations made in the literature sent out by the employer, his measure of damages is not that for breach of contract, but that for deceit, which is the loss sustained, and does not include the profits of which he has been deprived.

3. BANKRUPTCY ⊂⇒91(1)—SOLVENCY—BURDEN OF PROOF.

On contest of a petition in involuntary bankruptcy based on fraudulent concealment of property, the debtor has, under Bankr. Act, § 3, subd. C (Comp. St. 1916, § 9587), the burden of showing his solvency.

⊂⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

4. BANKRUPTCY ⬅54—SOLVENCY—ASSETS—CONCEALED PROPERTY.
    Funds which the alleged bankrupt has concealed cannot be included in his assets in determining his solvency.
5. BANKRUPTCY ⬅56—ACT OF BANKRUPTCY—"CONCEALMENT" OF PROPERTY.
    It was a concealment of his property, constituting an act of bankruptcy, for the debtor, on demand by a creditor to know what he had done with money, to reply that he had it in a safe place, and that it was available on a settlement, but that he had offsets amounting to more than the creditor's claim.

    [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Concealment.]

In Bankruptcy. In the matter of C. N. Burg, alleged bankrupt. Bankruptcy adjudged.

Etheridge, McCormick & Bromberg, of Dallas, Tex., for petitioning creditors.

Crane & Crane, of Dallas, Tex., for bankrupt.

JACK, District Judge. The Waterloo Gasoline Engine Company, alleging that it was a creditor of Burg in an amount in excess of $500, and that he had less than 12 creditors, filed petition praying his adjudication as a bankrupt.

Defendant filed answer in which he excepted to the plaintiff's petition, on the ground that he had more than 12 creditors, and, further answering, denied that he was bankrupt, denied that he had committed any act of bankruptcy, and specially denied that he was indebted to the petitioning creditor, against whom he pleaded a claim in offset.

[1] The list filed by defendant showing his creditors at the date of the filing of the petition discloses 24, not including the plaintiff. Only 3 of them were for more than $100, the highest being for $252.56, and 12 of them were for sums under $5. These small claims were current accounts for groceries, drugs, dry goods, milk, gas and oil, telegrams, telephone bills, water, light and gas bills, etc., such as are contracted and paid for from month to month. Such creditors are practically secured, as their bills have to be paid from month to month before further necessities can be obtained. The bankruptcy law is never invoked by any such small creditors, who themselves have adequate remedy for the collection of their accounts by cutting off further supplies. As to these accounts, I think the maxim, "De minimis non curat lex," applies. Such was the holding of Judge Treber in Re Blount (D. C.) 142 Fed. 265. As was well said in that case:

"If the contention of the respondent is to be sustained, the involuntary feature of the Bankruptcy Act would be a dead letter; for any insolvent who desired to prefer some of his creditors, leaving out one or two, could always manage to have as many as 20 creditors by purchasing for his personal use and that of his family small things amounting to sums ranging, as in the case at bar, from 10 cents to $2, and having them charged. By paying them the succeeding month, after he had made some small purchases, to be charged again, it would always leave a number of creditors ready to be used whenever proceedings of this kind are instituted against him. It is hardly reasonable to suppose that creditors of that kind, who feel secure in having their bills promptly paid, would want to incur the risk of losing a good customer in order to join a bona fide creditor to institute proceedings in bankruptcy. All laws

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

must be given a reasonable construction, and for this reason the claims herein before recited must be disregarded in determining the number of the creditors of Mr. Blount at the time these proceedings were instituted, and if this is done it clearly appears that there were less than 12 creditors."

So in the case at bar, if these small claims are disregarded, there are less than twelve creditors. Accordingly the exception was overruled. However, later, and before the trial of the case on the merits, two other creditors intervened, so that, as finally presented, there were three petitioning creditors.

Briefly stated, the facts out of which plaintiff's claim arose, and on which defendant bases his counterclaim and set-off, are as follows:

Plaintiff is a manufacturer of kerosene and gasoline engines, and a tractor known as the Waterloo Boy, so named for the home city of the company. Burg, who had been working as a clerk in an implement house in Dallas, which handled this tractor, on January 28, 1916, entered into a contract with the plaintiff, under the terms of which he was employed for one year as agent in the state of Texas for the sale of the engines and tractors manufactured by plaintiff. It was agreed that Burg should put at least two men besides himself at work in organizing the territory and pushing the sales, and that he should pay $522.50 net for each tractor shipped from the factory, and $550 net for each tractor shipped from some distributing point in Texas, the plan being that Burg should order the tractor to be shipped to the purchaser secured by him at a price in advance of that named, the difference to be his commission. Payment was to be made by a sight draft by Burg on the purchaser with bill of lading attached, returnable to plaintiff at Waterloo, Iowa, the plaintiff to then give Burg credit for his commission.

It was further agreed that the Waterloo Company should carry at three distributing points a stock of four tractors for the convenience of Burg, and should likewise carry a sufficient stock of gasoline engines at these points to take care of the trade. Gasoline engines were to be sold at prices named by the Waterloo Company, the defendant to receive a commission of 10 per cent. thereon. He was likewise to receive a commission of 15 per cent. on sales of extra parts for repairs. Burg was to be furnished by the company with literature for distribution in his territory.

Operating under this contract, Burg sold a number of tractors for which he did not draw drafts payable to the company, as stipulated in the contract, but himself collected the price and failed to account for same. Repeated demands were made on him by letter for a statement and remittance of the amount collected, but without avail. Finally, in answer to a letter in December threatening to place the matter in the hands of an attorney, Burg wrote, urging that this be not done, and adding:

"There are things in your claim for goods that have been returned to the warehouse by customers and then to you at factory by forwarding company in car that was shipped you some time ago."

Finally Johnson, manager of the company, came to Dallas and checked up his account with Burg. The statement, as made out by

Johnson, was several thousand dollars too much, and, after checking over the books, it was found that there was due the plaintiff $8,295.69, as against which Burg for the first time made claim for damages suffered by reason of the fact that the tractors sold did not come up to representation, claiming that he had for that reason lost in profits more than the amount of the balance due to the Waterloo Company.

On the trial of defendant's claim much evidence was offered as to the merits and demerits of the tractor. I am of the opinion that the tractor was too light for the work required of it in plowing black waxy lands of Texas. The greatest defect perhaps was in the radiator. It held only about 8 gallons of water, when it was represented in plaintiff's literature to hold 12. As a result the water boiled quickly, and the engine became overheated. A fresh supply of water had to be frequently poured into the radiator, and even then the results were not good. Furthermore, the wheels were weak. The ends of the spokes were bent at the rim into the form of an L and riveted on, when they should have been, and later were made, T-shaped at the rim, thus giving a stronger purchase. These defective spokes caused the wheels to give way. There was also much trouble experienced with the valves.

As soon as the company learned of the trouble with the wheels, they notified Burg that they would replace all wheels that gave way with heavier wheels made with the T-spokes, charging the purchasers only the freight. The radiators, however, could not be changed.

There was more or less delay in shipping out the new wheels, owing to the difficulty in buying iron. As a result the tractor was not popular. There were constant complaints coming in from customers, and finally the company sent, at Burg's request, a mechanic who devoted several months of his time to realigning and repairing the tractors which had been sold. His salary was paid by Burg, $1,032.73. A small part of his time, about ten days, was spent in helping Burg demonstrate the tractors. His salary for ten days would amount to about $30, and it is claimed by Burg that the company should pay all of the rest of the mechanic's salary, say $1,000.

The presence of Mahan was made necessary by the defects in the tractor, for which Burg was in no wise to blame, nor for which am I disposed to place too much blame on the Waterloo Company. Tractor engines are still in the experimental stage, and improvements are constantly being made. What might be a good tractor for sandy lands in other states might prove a failure in the black stiff lands of Texas. I think, however, that $1,000 of Mahan's salary should be credited on the account. The company agrees that a further credit of $307.50 should be given him, being commissions on tractors sold direct by the company in his territory after the term of his contract, but while his name was still being published as the agent and representative of the company. Allowing these two credits would leave $6,988.19 due the company, as against which Burg claims damages more than offsetting same.

[2] There has been no violation of the contract entered into by the parties. Burg undertook to sell as agent a particular tractor, and the company undertook to supply such tractors in such quantities as

might be called for at a given price. The company did this. The only complaint is that the tractor did not come up to the representations made in the literature sent out.

The measure of damages in an action for the violation of a contract is the loss which one has suffered and the profits of which he has been deprived as a direct and proximate result of the breach. This, however, is not an action for violation of a contract, the contract having been fulfilled, but is an action based on fraud and deceit and misrepresentation as to the tractor and what it would do.

In cases of deceit and misrepresentation the remedy of the party deceived is to cancel the contract and sue for such actual loss as he may have suffered. George v. Hesse, 100 Tex. 46, 93 S. W. 107, 8 L. R. A. (N. S.) 804, 123 Am. St. Rep. 772, 15 Ann. Cas. 456; Smith v. Bolles, 132 U. S. 125, 10 Sup. Ct. 39, 33 L. Ed. 279.

The measure of the recovery to which Burg is entitled is not the profits which he would have made had the tractors been as represented, even were the evidence sufficiently certain to enable the court to arrive at such profits, but it is the loss which he has sustained, and the evidence fails to show any loss other than the amount paid Mahan, for which he should be allowed a credit.

When Burg discovered that the tractors were not as represented in the literature and were not suited for the purpose for which sold in his territory, he did not elect to rescind the contract, as he might have done, but, on the contrary, he continued to sell the tractors, he claims, relying on the promises of the company to make good the defects. Thus, having continued to sell to his customers tractors which he knew to be unsuited to the work expected of them, he is in poor position to complain of the conduct of the Waterloo Company. Not only did he continue to sell the tractors to the farmers in the territory allotted him, but he deliberately put the price in his own pocket instead of remitting to his principal, in order, he says, that he might protect himself against his principal for furnishing such defective tractors, which he, knowing the defects, nevertheless continued to sell his customers.

The utmost good faith is required of an agent in his dealings with his principal, and the continued collection of funds belonging to the principal, without the latter's knowledge, and failure, notwithstanding repeated demands, to account for same, cannot be justified.

The special items sought to be recovered by defendant are for profits he would have made had R. B. George, T. D. Puckett, and other subagents appointed by him sold the number of tractors they undertook by their contract to sell, and which he averred they would have sold had the tractors been as represented. George deposited with Burg as forfeit money the sum of $600, being $25 each on 24 tractors which he agreed to sell, and on which tractors Burg averred he would have made a profit of $1,320 in addition to the deposit had George sold the machines. He alleges similar loss of profits which he would have made from the sale of other tractors by other subagents who, like George, had made similar deposits. It is by no means certain that these subagents would have made the sales even had the machines been

up to representations, but even so, such lost profits would not constitute the measure of damages in actions of this character.

It may be here noted that, although Burg bitterly complains of plaintiff for not furnishing tractors in strict accord with catalogue representations, and although he claims, and I think the evidence shows, that the tractors furnished were unsuited for the purpose for which they were sold, he has not returned to these various subagents their deposits, but, on the contrary, has appropriated such deposits to his own use.

### On Question of Solvency and the Act of Bankruptcy.

[3] The burden of proof was on the defendant, Burg, to show his solvency. In re Crenshaw (D. C.) 156 Fed. 638; In re Schenkein (D. C.) 113 Fed. 421; Bankr. Act, § 3, par. C. (Comp. St. 1916, § 9587). . If to the amount due the Waterloo Company $6,988.19 be added the amounts due various creditors shown in defendant's answer, $687, his total indebtedness would be $7,675, not including deposits made by subagents: George, $600; Burnside, $475; Lee & Co., $625; Puckett, $1,000—or a total of $2,700. Several of these subagents bought a few cars which have been credited on their deposits, so that the whole $2,700 is not due them. There is at least, however, due as much as $2,400, which would bring the total indebtedness of Burg up to $10,-000, whereas his total assets aggregate only $9,005.11. Burg claims that, if he were agent of the Waterloo Company, these various deposits were obligations of his principal. The deposits, however, were made on contracts of subagency, and the subagents may look to the agent even if they might also look to the principal. As Burg has the money and does not pretend to have turned it over to his principal, and as he asserts the cars were not up to representation, it seems clear that these subagents would have an action against him for the return of their deposits, and that he would be indebted to them in that amount.

[4] It is not necessary, however, to include the indebtedness due the subagents in determining the solvency of defendant. The evidence submitted fails to show to the satisfaction of the court that his assets were worth $9,005.11, as claimed, or more than his indebtedness. The funds belonging to the Waterloo Company he has concealed, and they therefore cannot be included in his assets in determining the question of solvency.

[5] Johnson testified that just prior to filing the bankruptcy petition, when he demanded of Burg to know what he had done with the money collected on tractors sold, he replied that he had it in a safe place and that it was available on a settlement, but that he had offsets amounting to more than petitioner's claim. It had never before been claimed, as now, that the money had been invested in his business, and the court accepts the testimony of Johnson rather than that of Burg as to what the latter told him about the matter. This constituted a concealing of his property and was an act of bankruptcy. In re Shoesmith, 135 Fed. 684, 68 C. C. A. 322; Ziegler v. Ziegler, 68 Hun, 177, 22 N. Y. Supp. 812.

A decree will be entered adjudicating defendant a bankrupt.