HOUGH ET UX. *v.* RESERVE GOLD MINING
COMPANY

No. 3040

August 31, 1934.                    35 P. (2d) 742.

*Harwood & Diskin,* for Appellant:

*Boyd & de Journel* and *James D. Finch,* for Respondents:

## OPINION

By the Court, DUCKER, J.:

This action was instituted by respondents. They will be hereinafter referred to as plaintiffs. The action was tried to the court on a second amended complaint, answer and reply. Three causes of action are alleged. They are:

First. That on the 21st day of January, 1924, the plaintiffs sold to the defendant one thirty-ton cyanide mill, situated in Mill Canyon, Cortez Mining District, county of Eureka, State of Nevada, for the sum of $28,000 under the terms of a written contract by which defendant promised to pay the sum of $15,000 within one year from said date, and the sum of $13,000 within two years thereafter.

Second. That defendant is indebted to plaintiffs in the sum of $5,933.02 for assessment work done, taxes paid upon and traveling expenses incurred in connection with certain mining claims located in said Mill Canyon.

Third. That on the 30th day of April, 1926, an account was stated between the plaintiffs and the defendant by which a balance of $33,000 was found due to the former from the latter.

The answer put in issue the material allegations of the complaint. This appeal is taken from the judgment in favor of plaintiffs and the order denying defendant's motion for a new trial.

It appears that in August of 1920 M. J. Hough had an option on 875,000 shares of the capital stock of the Nevada Treasure Mining Company and entered into a written agreement with Thomas J. Kearns for the sale

to him of all of said stock for the sum of $30,000, and for the further sum of $20,000 to be paid to the National City Bank of New York where said stock was held in escrow. It was further agreed that upon the release of said stock from escrow Hough would further deposit 200,000 shares of said stock in escrow in some bank acceptable to Kearns to be delivered to him when he paid the said bank to Hough's credit on or before three years from the date of the agreement the sum of $30,000. Later in the year a supplemental written agreement was entered into between Hough and Kearns in which it was recited that in drafting the former agreement a certain fifty-ton cyanide mill, including tanks, machinery, and building materials owned by Hough situated on the property of the Nevada Treasure Mining Company at Mill Canyon, was not included in the former agreement, and that it was the intention of both parties to include the same. In this later agreement the payment of the sum of $2,000 on account of said sum of $30,000 was acknowledged. It was further agreed that upon the payment of the $20,000 to the New York bank, and the sum of $28,000 to the bank holding in escrow the 200,000 shares of stock (which it was agreed should be the First National Bank of Elko, Nevada), Hough would execute and deliver a bill of sale to Kearns for the mill, tanks, machinery, and building materials. It was agreed also that the title to the mill should not pass to Kearns until the full balance of $48,000 shall have been paid.

Pursuant to the agreement the 200,000 shares of stock were deposited in escrow in the Elko bank and have never been taken out by Kearns, nor was the money paid to Hough for such stock and mill.

The defendant corporation was formed in December, 1923. The original incorporators were M. J. Hough, Thomas J. Kearns, and James T. Boyd. Thomas J. Kearns was president and M. J. Hough secretary of the defendant corporation from the date of its organization until March, 1926. Prior to the date of the trial Thomas J. Kearns died.

In support of the first cause of action, plaintiffs introduced in evidence a written contract, of which the following is a copy:

"This Agreement made and entered into on the 21st day of January, A. D. 1924, between M. J. Hough and his wife, Minnie J. Hough, of the town of Kearns, County of Eureka, State of Nevada, the parties of the first part, and the Reserve Gold Mining Company, a corporation duly organized and existing under and by virtue of the laws of the State of Nevada, party of the second part: Witnesseth: That the said parties of the first part, in consideration of the covenants and agreements on the part of the party of the second part hereinafter contained, agree to sell and do sell unto the party of the second part all that certain personal property lying on the ground of the Reserve Gold Mining Company, a Corporation, situated in Mill Canyon, Cortez Mining District in the County of Eureka, State of Nevada, and more particularly described as follows, to-wit:

"One 30-ton cyanide mill complete for the sum of twenty-eight thousand ($28,000.00) dollars, gold coin of the United States, as follows, to-wit:

"The sum of Fifteen Thousand ($15,000.00) dollars, gold coin of the United States, in one year from the date of the execution of this agreement; and the sum of Thirteen Thousand ($13,000.00) dollars, gold coin of the United States, in two years from the date of the execution of this agreement.

"It is mutually understood and agreed that all holdings of the Reserve Gold Mining Company, among which are the following mining claims, to-wit: Silver Knight, Pocatello, Iron Queen, Hidden Treasure, Hidden Treasure Extension, Emma E. (Patented Mine) and Lead Prince Lode Mining Claims, together with mill and machinery, buildings and other improvements thereon shall be held as security by parties of the first part until all the payments herein provided for shall have been fully paid, when said property shall vest fully and completely in the party of the second part, free and

clear of any and all incumbrances or liens of any kind or character.

"It is further mutually understood and agreed that this agreement shall bind the heirs and assigns of respective parties and successors of the respective parties.

"It is further mutually understood and agreed that the party of the second part shall have the right to immediate possession of the property and erect the same for the purpose of reducing ores and such other uses as to the party of the second part may seem fit.

"In Witness Whereof, the parties of the first part have hereunto set their hands and seal and the party of the second part has caused this instrument to be signed by its President and Secretary and its Corporate seal attached, the day and year first above written.

"M. J. Hough.
"Thomas J. Kearns.
"Reserve Gold Mining Company,
    "by its President Thomas J. Kearns.
    "by its Secretary M. J. Hough.    [SEAL.]"

The agreement was acknowledged by the plaintiff Hough.

Defendant assigns as error several rulings of the court in regard to the testimony of Hough concerning said contract of January 21, 1924, which was marked "Exhibit A." The following questions were asked:

"Mr. Finch: Q. Now, Mr. Hough, I hand you this paper which you have just identified, marked 'Plaintiffs' Offer A,' and ask you if your signature appears on this document? A. Yes.

"Q. What other signatures appear on that document?

"Mr. Diskin: Now, if your Honor please, we object to that upon the ground that this witness is disqualified from testifying if he purports to identify the signature of Thomas J. Kearns, for the reason that Thomas J. Kearns is dead, and under the statute this witness may not testify."

The objection was overruled, and the witness answered: "A. Thomas J. Kearns and M. J. Hough."

**1, 2.** Defendant insists that the ruling violates section 8966, N. C. L., which provides that no party shall be allowed to testify when the other party to the transaction is dead. While the rule of the statute, which aims at equality, is salutary in a general way, it sometimes operates harshly in particular cases by preventing a party from proving his case. A statute of this character should be construed so as not to exclude testimony unless clearly inhibited by its terms. In other words, it ought to be construed in view of the mischief it might cause. The testimony complained of went merely to the genuineness of the signature of the decedent. The witness did not testify that he saw Kearns sign his name to the contract, but that it was his signature which knowledge he may have gained from other sources. In fact, he testified that he was familiar with Kearns' signature, having received 200 letters from him. As the testimony was open to contradiction by witnesses who might be familiar with the signature of the decedent, we feel that it was not excluded by statute. The testimony was admissible for what it was worth. While there is authority to the contrary, the weight thereof derived from decisions construing similar statutes is that in a transaction between a witness and the decedent, the former's testimony as to the genuineness of the latter's signature or handwriting is not excluded by such statutes. Hoag v. Wright, 174 N. Y. 40, 66 N. E. 579, 63 L. R. A. 163; Britt v. Hall, 116 Iowa, 564, 90 N. W. 340; Sawyer v. Grandy, 113 N. C. 42, 18 S. E. 79; Daniels v. Foster, 26 Wis. 686; Johnson v. Bee, 84 W. Va. 532, 100 S. E. 486, 7 A. L. R. 252; 40 Cyc. 2327.

Appellant cites Schwartz v. Stock, 26 Nev. 128, 65 P. 351; Lovelock Lands, Inc. v. Lovelock Land & Development Co., 52 Nev. 140, 283 P. 403; and Bright v. Virginia & Gold Hill Water Co. (D. C.) 245 F. 175, but we find nothing in the rulings of these cases opposed to the view we take here.

The second assignment of error has been withdrawn.

**3-6.** The third assignment goes to the admission of

the contract in evidence over appellant's objection that the proper foundation had not been laid, and the further objection that the contract on its face shows that two officers of the defendant corporation, to wit, the president Kearns and the secretary Hough, purport to bind the corporation by a contract which they in their individual capacities executed with themselves as officers of the corporation. As to the first branch of the objection, it is sufficient to say that the signatures of the president and secretary and the impress of the corporate seal proved prima facie that the instrument was duly executed by the corporation. Gray et al. v. Fred B. Neuhoff Co., 124 Cal. App. 567, 12 P. (2d) 1036, 1037; 6 Cal. Jur. 686. See Evans v. Lee, 11 Nev. 194, and Clark Realty Co. v. Douglas, 46 Nev. 378, 212 P. 466. The foundation for the admission of the contract in evidence was therefore properly laid. As to the second branch of the objection, it may be said that the fact that Kearns' signature appears on the contract in an individual capacity is of no moment, for it is obvious that he was not a party. Nor does the mere fact that the plaintiff Hough as an individual entered into the contract with the corporation of which he was a director and secretary, vitiate the contract. We can conceive of no good reason for preventing a corporation from purchasing or entering into a valid contract to purchase property from an individual simply because he happens to be an officer of the corporation. This is not an instance of a director of a corporation exclusively contracting with himself as an individual, as was the case in Smith v. Pacific Vinegar & Pickle Works, 145 Cal. 352, 78 P. 550, 104 Am. St. Rep. 42, cited and quoted from extensively by defendant. Nor does it appear that the contract entered into was without the knowledge and sanction of a majority of the directors independently of the plaintiff Hough. The execution of the contract by the corporation implies full knowledge on its part. In such a case the better view, sustained by the weight of authority, is that a contract between a corporation and an officer thereof

"is not void per se, nor is it voidable, except for unfairness or fraud for which it will be closely scrutinized in equity." 14 A. C. J. pp. 118, 119, and cases cited in notes 31, 32, and 33. See Bassett v. Monte Christo G. & S. M. Co., 15 Nev. 293.

7, 8. Assignments of error IV, V, VI are grouped with reference to the same subject matter. They concern the rulings of the court in regard to parts of Hough's testimony offered to establish the second cause of action for services rendered by him for the corporation in doing assessment work and advancing money in payment of taxes. Over defendant's objection Hough was permitted to testify that he was authorized to do the work by Thomas J. Kearns as president of the company, but this answer was stricken by the court. Later the witness was shown an account book with the Reserve Gold Mining Company and examined concerning it over the objection of the defendant that Thomas J. Kearns was dead. The objection was overruled and there was admitted in evidence a written statement of the account entitled "Reserve Gold Mining Company, Dr. to M. J. Hough, per Thomas J. Kearns, Pres.," which purported to show the amount of money due to Hough from the Reserve Gold Mining Company. It is contended that Hough's testimony and the evidence of the written account admitted in support of the second cause of action are in violation of the law as announced by this court in Lovelock Lands, Inc. v. Lovelock Land & Development Co., 52 Nev. 140, 283 P. 403. We do not think so. In the Lovelock case the witness Wooster was permitted to testify to transactions with representatives of the defendant corporation, who had died. That is not the case here. The testimony that Kearns authorized the employment was stricken out and the witness testified to no conversation with him. He was qualified to testify to the work he did for the company and to the account kept thereof and of payments made for the company regardless of the demise of the president. The case of Schwartz v. Stock, 26 Nev. 128, 65 P. 351, relied on by defendant,

is not in point. There the books, which the appellant sought to authenticate and testify to the correctness of the transactions contained therein, clearly held records of transactions by the witness with the deceased in his lifetime. In the instant case the items of the account merely tended to show work done, and payments made for the corporation. It is true at one point the witness testified in regard to certain items that he got payment for assessment work from Thomas J. Kearns, because he was president of the company, and the court refused to strike it out on defendant's motion. The testimony was not responsive to the question and if there were any error it was harmless.

The trial court made the following finding which is the basis of the judgment in favor of plaintiffs: "That upon the express contract, covenants and agreements of January 21, 1924, entered into between the plaintiff, M. J. Hough, and the defendant, and set forth in the first cause of action herein, the defendant thereafter became indebted to the plaintiff in the sum of $28,000, and that by reason of the implied contracts, facts, matters and things set forth in the second cause of action of the plaintiff, the defendant became further indebted to said plaintiff in the sum of $5,933.04; that the indebtedness and the grounds therefor alleged in the first and second causes of action were the consideration for the contract, promises and agreements entered into between the plaintiff and the defendant on or about the 1st day of March, 1926, by the way of an account stated between them, and the first and second causes of action were superseded by the plaintiffs' said alleged third cause of action, which the court finds to be true, and which therefore relieves the court of any necessity for making further findings of fact respecting the allegations contained in said first and second causes of action, and of any controverted contentions or issues respecting the first two alleged causes of action, wherefore the court finds that on or about the first day of March, 1926, an account stated was agreed upon between plaintiff M. J. Hough and defendant, in which a balance of

$33,933.04 was agreed upon as being the amount owing from defendant to plaintiff at that time. The court finds that plaintiff in his complaint demands judgment of $33,000 as the amount due at that date."

9. In addition to some other legal objections as to this phase of the case, which we will notice later, defendant contends that the finding is not supported by the evidence. We think that it is, and will state it in substance. A special meeting of the board of directors of the defendant company was held in the law office of Milton Badt and James Dysart in Elko, Nevada, on March 1, 1926. At this meeting Thomas M. O'Brien was elected president, plaintiff Hough vice president, and Sarah A. Gallagher secretary. Mr. Dysart testified in substance that he, as an attorney, acted for all the parties. He also took notes of the business transacted by the directors at this meeting for the purpose of preparing the minutes. From these notes he later wrote the minutes of the meeting and forwarded them to Sarah A. Gallagher at her address in Boston, Mass. The witness was shown the minute book of the defendant corporation in which appeared the minutes of said meeting and asked if they were the same minutes as written by him. He testified that they had been substantially changed and did not correctly set forth the transactions held at the meeting. A carbon copy of what we will call the Dysart minutes was admitted in evidence. Omitting parts having no bearing upon the sufficiency of the evidence to support said findings, the Dysart minutes read as follows: "Be it Resolved that this corporation accept a proper deed of conveyance from the Nevada Treasure Mining Company conveying all of its rights, title and interest in and to the following described mining claims: (description). * * * And be it further resolved that this corporation assume all of the just and outstanding debts of the said Nevada Treasure Mining Company at the date of the execution and delivery of the said deed. * * * " The president announced that as per itemized bill presented to this board of directors that this corporation was indebted

to one M. J. Hough in the sum of $33,933.04 on account of balance due the said M. J. Hough as the purchase price of the mining property owned by this company and on account of taxes being advanced by the said M. J. Hough and for the annual assessment work on the mining claims owned by this company; and after a thorough discussion of the said indebtedness the following resolution was unanimously adopted, to wit: "Be it resolved that the president and secretary of this corporation execute and deliver to the said M. J. Hough its promissory note in the sum of thirty three thousand nine hundred and thirty three and 04/100 dollars, such note to be payable on or before eighteen (18) months from the date of this meeting, such note to be given without interest until maturity and that the president and secretary of this corporation also execute and deliver to said M. J. Hough a proper real and chattel mortgage as security for the payment of said note covering all of the mining property and premises, both real and personal, owned by this corporation and situate in Mill Canyon Cortez Mining District, County of Eureka, State of Nevada, such mortgage to provide for the payment of attorney's fees and all costs that might be incurred in collecting said note or foreclosing the said mortgage, with further provision that said note shall draw interest at the rate of six per cent. after maturity and until paid.  *   *   * "

The witness testified that these minutes recited the facts that occurred at that meeting; that at that time the board of directors approved Hough's bill and requested him to accept a note and mortgage for it; that in accordance with the foregoing resolution the witness prepared a real and chattel mortgage and forwarded it to Miss Gallagher to be executed by the corporation; that the same conformed to the agreement entered into at that time between Hough and the directors; that he also prepared and forwarded a note with the mortgage. A real and chattel mortgage dated March 1, 1926, of a number of mining claims in said Mill Canyon and personal property thereon including

a fifty-ton cyanide mill complete, not yet assembled, for $33,933.04, in which the defendant corporation appeared as the mortgagors and Hough as the mortgagee, executed by the defendant, was exhibited to the witness and introduced in evidence. He identified the mortgage as the one he prepared and forwarded, and testified that portions of it had been changed by elimination with red ink lines. The mortgage was introduced in evidence and shows such changes. He also identified a note of the same date for the same sum executed by the defendant to M. J. Hough, a copy of which appeared in the mortgage, as the note drawn by him, in accordance with the resolution, and forwarded to Miss Gallagher. It was introduced in evidence. The plaintiff Hough testified that he saw the note and mortgage which were introduced in evidence, at the First National Bank of Elko about the 1st or 2d of July, 1926; that he examined the mortgage and refused to accept it on account of the changes by eliminations. There was introduced in evidence by plaintiff a letter of date April 30, 1926, from Thomas J. O'Brien, who was then president of the defendant corporation, to plaintiff Hough, which reads:

"Dear Mr. Hough:

"Your letter just received. I want to say to you, Mr. Hough, that there is no objection to your claim by any one. It is an honest debt acknowledged by Mrs. Kearns, Miss Gallagher, myself, and will be paid as per your agreement with Mr. Kearns, just as soon as possible. Mrs. Kearns' lawyer after looking over all the papers advised against signing the mortgage and note for you as prepared by Mr. Dysart. He says it is unfair and too one-sided. Now, Mr. Hough, see if I understand this matter. The company owes you something over $33,000 for the mill and other expenses, also $4000 for some additional claims you sold to Mr. Kearns when the new company was formed. There seems to be some misunderstanding about this matter also. Mr. Kearns wrote Miss Gallagher at that time, saying you gave those four claims to the company in order to get

the company started. I read the letter myself. Of course you know I would not expect you or any one else to deed over property to the company for nothing. So you can be assured you will be paid $4000 as per your agreement, or the property deeded back to you as you stated in your last letter.

"Now, Mr. Hough, what you want is to be paid these amounts, $33,000, or whatever the bill is, and the $4000 for the additional claims, and you want to be assured that it is paid within eighteen months from the time we were in Mr. Dysart's office the early part of March.

"I'm sure this matter can be adjusted satisfactorily to all especially when we are all agreed on the amount and the justice of the claim. Why don't you write Mrs. Kearns or Miss Gallagher?

"Mr. Hough, you say you have a contract signed by Mr. Kearns with the Company seal. Is this contract for something else besides what I mentioned? I mean something besides the $33,000 and the $4000. If so will you please let me know at once. In talking with some people in New York I gave them a statement of the Company's affairs. I surely would not want something to turn up after the mine gets started or a sale made. Let me know is there any other claims besides those already mentioned. Miss Gallagher says there is some other papers to come from you or Mr. Pray. I'll be glad when everything is in shape so we can decide what to do to start working the mine or make a sale. * * *"

Another letter from Mr. O'Brien to plaintiff Hough dated June 1 reads:

"Dear Mr. Hough:

"Your letter just received. I suppose you got my night letter which I sent you a few days ago. Miss Gallagher called me on the phone this morning and I read your letter to her and suggested to her that she have her lawyer prepare a deed to you folks for the four claims as you suggested, also requested her to send you a mortgage for your claim for $33,933.04. There is no reason in the world why there should be any difference or misunderstanding among us four.

Mrs. Kearns and Miss Gallagher recognize that the company owes you the money and want you to be paid first, which of course you will. Just as soon as Miss Gallagher tells me that your deed and mortgage is prepared I will go over to New York and sign it, which I expect will be this week. We understood that you held some kind of a contract with Mr. Kearns and we did not know its contents and when we were at the brokers office he asked us for a statement, so that was why it was necessary to have the thing complete. We will see him again shortly and I will show him your letter which I am sure will satisfactorily explain everything.

"I do hope everything will turn out satisfactory and that we will get some real money out of the mine and that we will all live to enjoy it. * * * "

10. It was upon these letters, the transactions at the office of Badt & Dysart in Elko on March 1, 1926, as reflected by the Dysart minutes, the note and mortgage.drawn shortly afterwards by Mr. Dysart pursuant to these minutes, and the testimony of plaintiff Hough and Mr. Dysart, that the trial court made the finding above stated. In so finding, the trial court necessarily rejected defendant's theory and evidence tending to show that any understanding or settlement reached was with reference to the indebtedness created by the escrow agreement of August 13, 1920, supplemented by the agreement of November 11, 1920. There is a substantial conflict in the evidence in this regard, and we may not disturb the finding of the trial court.

11. Defendant contends that the court erred in admitting in evidence the letters written by O'Brien to Hough. This objection is based upon the ground that the president of a corporation is without power to bind the corporation unless authorized so to do by a resolution of the directors. We will concede that the mere fact that a man is president of a corporation does not give him authority to bind it, which is the sum and substance of the authorities cited by defendant. But the admissions contained in the letters written by the president

of the corporation in this case were with reference to the indebtedness admitted in the Dysart minutes for which O'Brien, as president, was authorized by the directors to execute a note and mortgage. His authority to write Hough concerning this indebtedness was incidental to the authority conferred. Under such circumstances the admissions contained in the letters were admissible against the corporation. The facts complained of by defendant that the letters were written on O'Brien's private stationery and not signed by him as president were of no moment. He was president of the corporation at the time and was obviously writing in such capacity.

12. There is no merit in the contention that the trial court committed error in admitting over defendant's objection a letter written by James Dysart to Miss Gallagher, secretary of the defendant corporation. Error is predicated on the assumption that it was a privileged communication between the attorney and his client, the defendant corporation. The assumption is unwarranted. The evidence shows without dispute that Dysart acted as attorney for both parties in the matter. The circumstance that he was paid by the defendant is of no weight against the positive evidence of his dual relation as an attorney to the parties.

13. It is claimed by defendant that the statute of limitations has run against the third cause of action and that the court erred in denying its motion to strike this cause of action from the second amended complaint for that reason, and in refusing to sustain the allegations of defendant's answer in that respect to said third cause of action. This contention is without support. The third cause of action, added by the second amended complaint, did not assert a new claim but stated in a different form the same claim embraced in the first and second causes of action, to wit, the original indebtedness. There is no departure in substance from the subject matter of the action as instituted, and the amendment adding the third cause of action must therefore be held to relate back to the commencement of the action.

The law in this regard is well presented in Union L. Co. v. J. W. Schouten & Co., 25 Cal. App. pages 82, 83, 142, P. 910, 911. In that case the defendant had asserted that permission to file the amended complaint containing the second cause of action should have been denied because it was wholly a new and different cause of action and also for the reason that it appeared that it was filed more than two years after the filing of the original complaint. The court, speaking by Kerrigan, J., said:

"Neither of these objections is good. The amended complaint did not set up wholly a new and independent cause of action. Both causes of action were to recover the value of the same consignment of lumber, the charge for which, through an inadvertence, was omitted from the account as stated. Both causes of action had the same and identical purpose; hence the amended complaint cannot be held to have set forth a new cause of action. The authorities abundantly support this position. Born v. Castle, 22 Cal. App. 282, 134 P. 347.

"The test as to what constitutes a new cause of action is laid down in Anderson v. Wetter, 103 Me. 268, 69 A. 110, 15 L. R. A. (N. S.) 1003, as follows:

" 'The new count, offered under leave to amend, must be consistent with the former count or counts, that is, it must be of the like kind of action, * * * and such as might have been originally joined with the others. It must be for the same cause of action, that is, the subject matter of the new count must be the same as of the old; it must not be for an additional claim or demand, but only a variation of the form of demanding the same thing.'

"As both complaints were for the recovery of the price of the same lot of goods, the action itself, irrespective of the theory on which the right to recover is based, must be regarded as having been commenced when the original complaint was filed. There is no merit therefore in defendant's point that the statute of limitations had run against the cause of action set

forth in the amended complaint. Bogart v. Crosby & Van Haren, 91 Cal. 278, 281, 27 P. 603; Smullen v. Phillips, 92 Cal. 408–411, 28 P. 442."

See Harwood v. Carter, 47 Nev. 341, 222 P. 280.

As the third count in the second amended complaint did not present a new cause of action, the statute of limitations did not defeat it.

Defendant has presented other assignments of errors which we find to be unimportant and have therefore not discussed them. They have all been resolved against defendant's contention.

The judgment and order denying the motion for a new trial should be affirmed.

It is so ordered.