[Civil No. 3570. Filed March 16, 1936.]

[55 Pac. (2d) 636.]

F. H. MITCHELL, Appellant, v. THE VULTURE
MINING & MILLING COMPANY, a Corpora-
tion, Appellee.

250

Messrs. Kibbey, Bennett, Gust, Smith & Rosenfeld, for Appellant.

Mr. Howard Cornick, Messrs. Ellinwood & Ross, Mr. William H. Mackay and Mr. Jos. S. Jenckes, Jr., for Appellee.

McALISTER, J.—This is an appeal by F. H. Mitchell from a judgment in favor of the Vulture

Mining & Milling Company, a corporation, entered on a directed verdict granted upon motion of the defendant at the close of the plaintiff's case.

The substance of the second amended complaint on which the case was tried is that in the summer of 1930 the Vulture Mining & Milling Company, a corporation, hereinafter called defendant, owned thirty-one mining claims, patented and unpatented, near Wickenburg, Arizona. It had an authorized capital of one million shares of the par value of one dollar each, six hundred thousand of which were treasury stock it desired to sell for the purpose of raising funds to develop its mining property. F. H. Mitchell, hereinafter called plaintiff, was an experienced mining engineer and salesman who had friends in the eastern section of the United States through whom he felt he could contact prospective purchasers. So, on or about August 10, 1930, he and the defendant entered into an agreement by which he was granted for a reasonable time "the exclusive right to sell in the eastern states of the United States the treasury stock of the defendant," and pursuant to this agreement the defendant's board of directors appointed him its agent and gave him power to hire assistants, to select a bank as depository for funds from the sale of stock, and to issue certificates thereof on behalf of the defendant. It was agreed that the plaintiff would go to the eastern states at his own expense and for a reasonable time devote his efforts exclusively to presenting the stock to prospective purchasers and making sales thereof at eighty cents a share and that he should receive as compensation therefor twenty-five per cent. of the proceeds of the sales made by or through him. For the purpose of fulfilling this agreement the plaintiff went east on August 21, 1930, and expended large sums of money in an effort to sell

the stock, the defendant being kept advised at all times of his activities and prospects. On October 7, 1930, the oral agreement was modified by the parties in writing in such a way that the plaintiff's exclusive right to sell the treasury stock of the defendant was limited to three hundred thousand shares, the other three hundred thousand being reserved for these two purposes: One hundred thousand for sale in the west by the defendant and two hundred thousand to remain unsold for the time being. Some of those he contacted desired to purchase all the treasury stock and upon the defendant's being advised of this it informed plaintiff that it did not care to sell a controlling interest, but would be glad to dispose of the three hundred thousand shares or any part thereof through him and encouraged him to continue his efforts to that end.

On the 29th day of October, 1930, while the plaintiff was actively endeavoring to sell the three hundred thousand shares and had reasonable prospects of completing a sale, the defendant, without advising him, granted a ten-day option on the six hundred thousand shares of treasury stock to the United Verde Extension Mining Company, a corporation, organized under the laws of Delaware and having its legal office in that state and its financial office in the state of New York. It is then averred that the option was granted to a purchaser in the eastern states, territory in which plaintiff had been given the right to sell, that the option was thereafter exercised by the United Verde Extension Mining Company, and that the result of this was to disable the defendant from performing its agreement and to deprive the plaintiff of the opportunity to fulfill his and to receive compensation for his services and to reimburse himself for the monies expended by him, in the sum of

$60,000, amended later, however, to read $10,000. It alleged also that in going east and maintaining himself there in an endeavor to sell the stock, in sending telegrams in connection therewith and in obtaining permits to sell, he expended approximately $2,000 and devoted seventy-five days of time, the reasonable value of each day's service being $100.

The defendant answered, admitting the execution of the option and its exercise by the company. It denied, however, that either act was performed in the east and alleged that the option and the sale of the stock covered thereby was made, exercised and fulfilled within the state of Arizona where the company had been authorized to and had actually carried on business for more than ten years. Every other allegation, not specifically admitted, was denied.

The contract set up, it will be observed, is one by which the plaintiff was granted for a reasonable time the exclusive right to sell three hundred thousand shares of the treasury stock of the defendant in the eastern section of the United States and the breaches alleged are, first, that the defendant sold the three hundred thousand shares in that section of the United States, and, second, that it disabled itself from performing its agreement by giving an option on the stock before the reasonable time he had been allowed to dispose of it had expired, thus rendering it impossible for the plaintiff to fulfill his agreement and thereby receive compensation for his services and reimbursement for the expenses incurred by him.

According to the evidence the plaintiff and D. R. Finlayson, president and manager of the defendant company, had been acquainted with each other for years and in 1930 were engaged in mining on separate properties in the vicinity of Wickenburg, Arizona. The plaintiff was an experienced mining engineer and

salesman with friends and acquaintances in the eastern section of the United States through whom he believed he could contact prospective purchasers of mining property and in July or August of that year Mr. Finlayson spoke to him about undertaking to sell in that section the defendant's treasury stock which it desired to dispose of for the purpose of raising funds with which to develop its mining property. Several conversations extending over a number of days were had between them relative to the matter and on August 10, 1930, these resulted in an acceptance by the plaintiff of the defendant's proposal which in substance was that the plaintiff was given the right to sell at his own expense in the eastern section of the United States the treasury stock of the defendant at eighty cents a share, his compensation to be twenty-five per cent. of his sales, and the price of the stock to be sold in the west was fixed at seventy-five cents a share. The plaintiff testified that the selling price of the stock in the west was a part of the agreement and he was corroborated in this respect by the fact that the defendant issued in its own name two prospectuses of the property, one for the east and one for the west, the two being identical in language, except that in the former the price of the stock was placed at eighty cents a share, while in the latter it was given at seventy-five cents, the five cents differential being due to the extra expense of handling it in the east. In addition, Mr. Finlayson wrote plaintiff on October 7, 1930, suggesting that he sell the stock there for seventy-five cents, for the reason, among others, "that it may reach your clientele there that it is 75¢ here." There is also the further consideration that it is not reasonable to presume that the plaintiff or any normal person would have agreed to go east at his own expense to sell stock solely on commission if

the owner was retaining the right to sell the same stock in the west at any price it saw fit, for instance, ten, fifteen or twenty-five cents a share.

Eleven days after the agreement was entered into plaintiff went east and at an expense to himself of $2,000 devoted his entire time to the undertaking from the day of his arrival there late in August until October 29, 1930, when he received a telegram from Finlayson reading as follows: "UV EX ten day option control stop hold off." This option included the stock the plaintiff had been authorized to sell and was exercised within six or seven days after it was given. When this occurred there was nothing further the plaintiff could do under the agreement, so he returned to Arizona and on July 27, 1931, filed this action to recover damages for its breach, the theory of his complaint being that his right to sell the stock in the east was exclusive and given for a reasonable time, and that the defendant had violated it, first, by selling the stock in his exclusive territory and, second, by optioning and selling it before the reasonable time he had to dispose of it had expired, thus rendering it impossible for either of them to carry out the terms of the agreement. In his complaint he set up the contract, except that portion of it fixing the price for which the stock was to be sold in the west, what he had done under it up to the time the giving of the option prevented him from doing anything further, and the extent of his damage. His failure to allege the selling price of the stock in the west as a part of the agreement sued on was doubtless due to the fact that he thought the sale had been made in the east. Believing this he could not, of course, have known when instituting the action that the stock had been sold in the west, and it is only reasonable to presume from the fact that he omitted any

reference to the price for which it was sold, that he was also without knowledge that it had been disposed of for less than the agreed price of seventy-five cents a share. This was disclosed at the trial, however, when the option to the United Verde Extension Mining Company was introduced in evidence. Plaintiff's counsel, when this occurred, expressed surprise and requested leave to amend his complaint as follows in order that it might conform to the proof:

"I. By striking out the last sentence of Paragraph V of said second amended complaint, and substituting therefor the following, to-wit: 'That as a part of the agreement between plaintiff and defendant by which plaintiff was granted the right to sell the treasury stock of the defendant, as aforesaid, it was agreed by and between plaintiff and defendant that the selling price of said treasury stock for a reasonable time should be and remain fixed at 80 cents per share in the Eastern States, and 75 cents per share in the Western states.'

"II. By striking out the words, 'the whole of said six hundred thousand (600,000) shares,' in the seventh and eighth lines of page 6, in Paragraph VIII of the complaint, and substituting therefor the following words: 'Five hundred thousand (500,000) shares of said treasury stock, and for a price much less than 75 cents per share.' "

This amendment, it will be observed, merely adds to the complaint that portion of the agreement fixing the price for which the stock should be sold in the west, seventy-five cents a share, and sets up defendant's breach thereof by selling it "for a price much less than seventy-five cents per share." The request was denied upon the ground that the amendment stated a new cause of action and was barred by the three-year statute of limitations, and upon this ruling the plaintiff rests one of its principal assignments, the only one, in fact, in view of the disposition we feel should be made of it, it is necessary to discuss.

Does the amendment, in view of the liberal rule prevailing in this jurisdiction on that subject, state a new cause of action? To my mind it was merely a fuller and more complete statement of the one then being heard and did not constitute a departure in substance therefrom. It simply supplemented the allegation that the plaintiff had been given the exclusive right to sell the stock in the east at eighty cents a share with the term of the agreement fixing the price for which the stock should be sold in the west, and it is clear from the evidence that the selling price of the stock in the west, seventy-five cents a share, was just as much a part of the agreement as was the plaintiff's right to sell it in the east at eighty cents. According to the complaint the agreement gave the defendant no right to sell stock in the east at any price but did permit it to dispose of some at least in the west, and the amendment simply completed the term or clause of the agreement relative to the selling price of the stock by giving that to be used in the west, the one to be charged in the east already appearing. I am unable to see how the cause of action as amended can be held to be a departure in substance from the one amended when the agreement violated, the parties, and the object to be attained were the same in both instances. The amendment was addressed to the same general subject matter as the original pleading, the agreement giving the plaintiff the right to sell the stock of the defendant and its breach, and even though it brought into the complaint a clause or condition of that agreement not in the original, yet it proceeded on the theory that when this was done the cause of action stated would still arise out of and rest upon the same agreement or transaction as the original. The amendment merely supplied a stipulation or term in the agree-

ment that was omitted therein and retained the cause of action alleged, except in one particular, and re-asserted it. Under the authorities that impress me as thoroughly sound it is sufficient if the amended cause of action retains even a part of the original and reasserts it. In *Mayes* v. *Magill,* 48 Tex. Civ. App. 548, 107 S. W. 363, 364, the court said:

"If the amended petition in any way retained even a part of the cause of action as asserted by the original petition, and afterward reasserted by the amended petition, it is sufficient to prevent the running of the statute after the original petition was filed."

Many years before this decision was rendered the Supreme Court of Texas, in *Thouvenin* v. *Lea,* 26 Tex. 612, had held in the following language that the allegation of an additional stipulation of an agreement does not constitute a new cause of action.

"The amended petition merely enlarges and states more fully and accurately the facts with reference to the same contract upon which the original petition was based. It only states an additional stipulation in the agreement between the parties, which was omitted in the original petition. It enlarges but in no manner contradicts the allegations previously made. The very object of an amendment is to supply the omissions of the original pleadings. And it never has been supposed that the statute of limitations would present any impediment to its being done at any time during the progress of the cause. The statute only operates as a bar when it is sought under the name of an amendment to present a new suit."

The same rule is followed in other jurisdictions, among which are California and Nevada. *Sieck* v. *Hall,* 139 Cal. App. 279, 34 Pac. (2d) 844, 854; *Hough* v. *Reserve Gold Mining Co.,* 55 Nev. 375, 35 Pac. (2d) 742. In the first of these the court said:

"A plaintiff may not abandon the entire case made by his pleading and make a new and different one by

way of amendment but so long as the cause of action set out in an amendment is not entirely foreign to the original action and the relief sought arises on the *same general state of facts* the amendment is proper and within the discretion of the court.'' (Italics ours.)

The rule is stated in the following language of subsection one of the syllabus to *Frost* v. *Witter,* 132 Cal. 421, 64 Pac. 705, 84 Am. St. Rep. 53:

''All that is required in allowing amendments to pleadings is, that a wholly different cause of action, entirely foreign to the original, cannot be introduced thereby, and that a party cannot be allowed to strike out the entire substance and prayer of his pleading, and insert a new case by way of amendment.''

That this rule is correct is further indicated by the fact that it is perfectly clear that a judgment based on a violation of the clause of the agreement—not to sell stock in the east—could be pleaded in bar of an action resting on a breach of the stipulation that the stock should not be sold in the west for less than seventy-five cents a share, or *vice versa.* It is equally true that the measure of damages applicable in the original and the amended causes of action was the same and that the allegations of each were subject to the same character of defense. And the test upon which appellee relies—that the amendment requires different evidence to establish it—is likewise without application, because the evidence necessary to prove the amendment would have been but slightly different from that required to establish the original cause of action, and the rule does not mean that the evidence must be exactly the same in every detail and item. If it did, there would seldom be any occasion or reason to allow amendments at all. *Born* v. *Castle et al.,* 22 Cal. App. 282, 134 Pac. 347. Such, in fact, was the language of the court in *Hanson* v. *Spring-*

*field Traction Co.,* (Mo. Sup.) 226 S. W. 1, 3, as the following excerpt will show:

"The new ground of recovery set up in the amended petition based on violations of the city ordinances did not constitute a departure or the substitution of a new cause of action. What is relied on in support of the contention that it did is that other evidence, to wit, proof of the city ordinances, would be required to establish it that was not needed to establish a case under the first petition. That a new cause of action is substituted by an amendment, unless the same evidence will support it that would have supported the original cause of action, must mean that the same evidence will establish the event or transaction declared on as the cause of action in the original petition and in the amended one; will show the two pleadings are based on the same occurrence. It cannot mean that every detail and every item of the evidence must be exactly the same, or otherwise the right of amendment would be of little use."

To hold that this amendment states a new cause of action against which limitation has run seems to me utterly out of harmony with the modern idea that amendments should be allowed with great liberality to the end that, wherever possible without prejudice to the other party, every cause of action should be decided on its merits. But to uphold the position that this amendment constitutes a new cause of action, instead of applying this rule, would take us back to the narrow, harsh construction of the term, cause of action, announced many years ago in the case of *Keppler* v. *Becker,* 9 Ariz. 234, 80 Pac. 334, but which was held erroneous and modified six years later in *Boudreaux* v. *Tucson Gas etc. Co.,* 13 Ariz. 361, 114 Pac. 547, 552, 33 L. R. A. (N. S.) 196. And, since the adoption of the liberal rule, it has been unfailingly adhered to in this jurisdiction, as a reading of the following decisions will disclose: *Hagen-*

*auer* v. *Detroit Copper Min. Co.,* 14 Ariz. 74, 124 Pac. 803, Ann. Cas. 1914C 1016; *Arizona Eastern R. Co.* v. *Old Dominion etc. Co.,* 14 Ariz. 209, 127 Pac. 713; *Gambrell* v. *McKean,* 28 Ariz. 427, 237 Pac. 196.

In 1928, however, it was held, in the case of *Kunselman* v. *Southern Pacific R. Co.,* 33 Ariz. 250, 263 Pac. 939, that a complaint based on an open account could not be amended by setting up an account stated without the amended complaint's being subject to the charge that it states a new cause of action, and it is upon this holding that appellee chiefly relies. I am unable to see wherein it has any bearing whatever on the matter here involved, because it is perfectly clear that an account stated is based on a distinct, separate and independent agreement from that involved in an open account. In such an action there is nothing to be alleged or established, except the fact that the parties agreed that a certain amount was due from one to the other, the mutual promises being new and constituting in themselves a complete, distinct agreement. Their relation to a stated account is virtually the same as that existing between the maker and payee of a promissory note, because the stating of the account renders all transactions pertaining to the various items of the original account a closed book, except for fraud or mistake, just as the execution and delivery of a note excludes the facts leading to the giving thereof from the pleadings and proof in a suit thereon. *Chittenden & Eastman Co.* v. *Leader F. Co.,* 23 Ariz. 93, 201 Pac. 843. The facts on which the original and amended causes of action in this case were based, however, happened at one and the same time and as a part of the same transaction, it being impossible to relate the agreement in full without stating the particular phases of it to which each refers. If the cause of action had been based origi-

nally on a violation of the stipulation set up in the proposed amendment and all reference to the defendant's selling the stock in the east omitted, the evidence necessary to support it would have been in large part the same as that introduced in substantiation of the pleading as it stood, so much so in fact that to hold that pleading it by way of amendment constitutes a new cause of action is overlooking the substance in pursuit of the shadow.

The fact that the effect of such a holding is that the amendment does not relate back but is barred by the statute of limitations is not, of course, a factor to be used in determining whether a new cause of action is in fact stated. Yet it is well to keep in mind that while it is a proper and wholesome rule that causes of action should be barred after the expiration of certain periods of time, since the evidence of the transactions relied on to constitute them is apt to be lost or become more difficult to produce with the passing of time, it was never the intention that such laws should be used to prevent one who moves diligently though erroneously from having his case heard on its merits. *Arizona Eastern R. Co.* v. *Old Dominion etc. Co., supra.* In fact the principal reason why limitation laws ever came into existence at all is to force the prompt trial of causes while the facts are still in mind and the evidence available for a determination of them on their merits, *Boudreaux* v. *Tucson Gas etc. Co., supra,* and it is apparent that this purpose was accomplished, so far as this case is concerned, when the action was filed in July, 1931, nine months after it accrued, and the whole matter, so to speak, thrown into the lap of the court. The defendant was then advised that it was being called upon to defend an action for damages arising out of its breach of the agreement with the plaintiff relative to the sale of its

stock, and this was sufficient to cause it to take every precaution to preserve evidence of that agreement in full. It could not have known at that time what turn the case might take before it was over, because amendments both before and during the trial are frequent occurrences to meet situations not known or fully appreciated when the action is instituted, but upon being served it knew that the plaintiff would be unable to prove his allegation that it had sold the stock in the east, and that if he did not already know it he would probably learn at the trial that the stock had been sold by it for less than seventy-five cents a share. Such being the situation, the defendant was hardly in a position to say that it was surprised at the request to amend or that it would have been injured by an order allowing it. *Brooks et al.* v. *Neer,* 46 Ariz. 144, 47 Pac. (2d) 452. However, it did make such a claim and, instead of treating it as a new cause of action barred by the statute of limitations, the court, if he felt there was sufficient basis for it, should have given time to defend against the amended pleading. The following language of the court in *Boudreaux* v. *Tucson Gas etc. Co., supra,* is particularly applicable:

"To permit the use of the technical law of pleading, formulated to facilitate trials and to render more certain the administration of justice, to defeat a hearing and determination of what is justice, is wholly inconsistent with the spirit and policy of our law, which seeks a determination of every case upon a trial of the merits."

It might be well, since there is to be a new trial, to say that in our view the defendant's motion for an instructed verdict upon which several of the assignments are based should not have been granted. According to the evidence the plaintiff and the defendant entered into an agreement by which the plaintiff was authorized to sell in the eastern states within

a reasonable time three hundred thousand shares of the defendant's treasury stock at eighty cents a share for a commission of twenty-five per cent., the plaintiff agreeing to go from his home in Arizona to that section and devote his entire time and energy to making a sale of this stock, all at his own expense. Pursuant to this agreement he went east and actively endeavored to sell the stock until October 29, 1930, when the defendant terminated his authority in respect thereto by optioning the stock to the Verde Extension Mining Company, and the plaintiff contends that the agreement and his actual partial performance of it was sufficient to make a binding contract not revocable without rendering defendant liable for breaching it, either in damages sustained as a result thereof or for the recovery of the reasonable value of his time and efforts and the expenditures incurred by him in attempting to carry out his part of the undertaking. It occurs to us that this contention is correct, because the agreement, even if merely unilateral prior to plaintiff's going east and entering upon its performance, became, when this took place, bilateral and mutual, the plaintiff's acceptance and actual part performance of it being sufficient consideration for the contract of employment. *Lapham* v. *Flint,* 86 Minn. 376, 90 N. W. 780; *Graham* v. *Lamp,* 174 Wis. 373, 183 N. W. 150; *Morning Star Mining Co.* v. *Bennett,* 164 Ark. 244, 261 S. W. 639. In 2 Mechem on Agency, page 2052, section 2454, the author says:

"The negotiations may also take another form. The principal may say to the broker in substance and effect, if not expressly, 'I will *promise* to pay you a commission if you will *promise* to list it, advertise it, or otherwise endeavor to find a purchaser.' This is the offer of a bilateral contract. The broker's promise may be made in words or it may be inferred as a

fact from his conduct, as, for example, in accepting the employment and entering upon the performance. In this case both parties are bound, and the principal will be liable to the broker for any breach of the terms of the contract.''

 The contract being mutual, the giving of an option and thus placing it beyond the power of the defendant to live up to its terms was just as effectively a breach as a sale by the defendant of the stock in the east, the territory the plaintiff alleged to be exclusively his, would have been. The defendant, it is true, had the power to terminate it any time it saw fit but no right to do so without subjecting itself to liability for whatever damages its act may have caused the plaintiff. Mechem on Agency, p. 405, § 568. It is utterly unthinkable that after he had entered into the agreement, gone east and, at an expense to himself of $2,000, devoted his entire time and effort for two months to selling the stock, the plaintiff's contractual status should have been such that the defendant could, before he had had a reasonable time in which to complete the undertaking, deprive him of the right to do so without rendering itself liable, at least, for the reasonable value of his services and reimbursement for expenditures made or incurred by him. The agreement specified no particular time in which he could make the sale but under all the authorities a reasonable time was implied. Restatement of the Law of Agency, p. 271, § 105; 2 C. J. 525.

 The evidence, as we view it, is such that it cannot reasonably be inferred from it that it was intended by the parties that the defendant was retaining the right to sell in the west the stock it was giving the plaintiff the right to dispose of in the east, or, in other words, that the general rule, that one

who gives another the exclusive right to sell property in certain territory does not deprive himself of the right to sell in other territory, applied. It is clear that the defendant did reserve at the time the agreement was made the right to sell some stock in the west, its desire being to dispose of a sufficient amount to meet a payment on its mining property of $10,000 due October 4, 1930, and that this was increased to three hundred thousand shares on October 7, 1930, but these facts, instead of compelling, or even justifying, the inference that it reserved the right to dispose of the three hundred thousand shares it authorized the plaintiff to sell, before he had had a reasonable time to make the sale himself, point rather to the conclusion that the right to sell it was to remain his until a reasonable period had expired. His letter of October 11, 1930, replying to defendant's of October 7th, does not demand, even though it may be held to permit, the construction that he waived all objection to defendant's selling in the west the three hundred thousand shares the letter of October 7th still left him the right to dispose of in the east. Believing, as the record discloses he did, that very little, if any, stock could be sold in the west, he merely expressed in that communication the view that it was immaterial how the stock was allocated as between the east and the west, because in his judgment it would take the efforts of both to dispose of the amount it was desired to sell, the burden of disposing of the bulk of it continuing in the very nature of the circumstances, he felt, to rest on him. This, in view of all the facts, did not justify only the one inference that the plaintiff no longer insisted on but waived his right to sell in the east the three hundred thousand shares of stock. The matter should have been submitted to the jury.

The judgment is reversed and the cause remanded for a new trial.

ROSS, J., concurs.

LOCKWOOD, C. J., Dissenting.—Dissenting opinions are generally a waste of time by the dissenting judge and a waste of space in the reports, for they cannot immediately affect the law as declared by the majority. But where the principle involved is one of importance and the rule laid down by the majority appears to be both unsound and contrary to that previously followed by the court, there is always a possibility, faint though it may seem at the time, that in a later case there may be a return to correct general principles, and that a dissenting opinion may add, in some small degree, to that most desirable result.

The tendency of the human mind to rationalize, in order to formulate a rule, scientific or legal, which will accomplish a desired result, is so great that in judicial circles it has even grown into a proverb. "Hard cases make bad law" has been reiterated again and again, until one would think that the lesson had been learned, but with every new case that presents an appeal to the emotions, the same conflict between judgment and desire reappears. That the ideal of every system of law is the attainment of perfect justice in every concrete case which may arise is a truism. The only question for us is as to how we may the most closely approach that end, for perfect justice is not to be found in the present life. We can only hope we will attain it in the hereafter. But what is justice? Justinian says it is "the set and constant purpose which gives to every man his due." If all men had the unselfishness of St. Francis and the omniscience and omnipotence of the Deity, the

task of giving to each that which was his due would be easy, and law and a method of enforcing that law would be unnecessary. But no man has ever possessed those qualities and few have even approximated them to a very minor degree, and it is because of these faults and weaknesses in human nature that the necessity for law and for legal procedure has arisen. At first law was merely the judgment and will of the wisest and strongest man of the tribe, expressed as a doom in a particular case after it had arisen, but ages of experience have shown clearly two fatal weaknesses in this system of endeavoring to do justice. No matter how wise or well-intentioned the judge might be, his personal prejudices and emotional reactions were bound to influence his reason. But even more, the uncertainty of what the judgment would be (for no one could anticipate the peculiar reactions of the individual judge who might hear his case), left men with no standard by which to guide their future actions, so that they might avoid litigation.

For these reasons, the whole course of the development of legal procedure has been a struggle to get away from the practice of leaving decisions to the emotional reactions and idiosyncracies of the particular judge as applied to the case after it had arisen, and to establish in advance general rules and standards which the judge would be obliged to apply to any case which was brought before him. It is impossible, however, for the human mind to anticipate every situation which may arise in the future, and it was early learned general rules which will do justice in *every* specific case cannot be formulated in advance. The pendulum swung back and forth, from the Draconian Code from which the judge could not depart, to a reliance upon his unfettered and individ-

ual. discretion. Many instances of injustice were bound to arise under either system of procedure, but one consideration eventually, and I believe permanently, tipped the scale. *Men can adjust their daily conduct in a reasonably satisfactory manner to any system of law so long as it is definite and certain, while uncertainty paralyzes all action.*

The English speaking peoples realized this early, and their development, in theory at least, has been towards "a government of laws and not of men." But even with them, the struggle has not always been easy. When cases arose in which an application of the accepted rules of law obviously worked an injustice, the desire to do concrete justice, even in violation of abstract law, was at times irresistible to the less far-seeing members of the judiciary, for they did not stop to consider that if they yielded to the insidious temptation, the ultimate result was bound to be a greater injustice for years, if not generations, to come. But even when they violated the spirit of the principle of "laws, not men," they tried to follow its letter, and instead of frankly admitting that, in their desire to do justice in a particular case, they had departed from the accepted rule, they almost invariably rationalized in an endeavor to show that the decision in reality did not violate the general law. This was usually done by so-called exceptions to the general rule, carefully formulated to fit the facts of the particular case, or by glossing over or ignoring of the facts which brought the case within the rule. Such an effort, with the result predetermined, was bound to be successful, but at what a cost! In order to do justice to A, a precedent was set which was unjust when later applied to B, C, D and E. And then the same process continued until all certainty as to the law had vanished, and no man could safely gauge

his future conduct, or know what were his rights under given circumstances. It is plain that the formulation of an exception to a general rule of law for the purpose of doing justice in one particular case, without first carefully considering the results which its adoption would have on myriads of other cases to which, in the future, it must be applied, or a straining or ignoring of the facts of a particular case, is, in the long run, invariably productive of far more harm than good. These general principles would seem to be so obvious that it is a mere platitude to repeat them, and yet they are so often disregarded or, as I believe they have been in the present case, overlooked that I feel they cannot be reiterated too often.

In the early history of the English law, the pleadings by which the parties brought their case to an issue of fact or law which would determine the judgment, were extremely formal, and after a pleading had once been filed, amendments thereto were only allowed under the rarest circumstances. This rule, like nearly all other rules of the common law, was, at the time and under the circumstances existing when it was adopted, on the whole better fitted to accomplish justice than a contrary one would have been. The reasons therefor need not be stated, for it would require too extended a discussion of society in the middle ages and the early Constitution and jurisdiction of the courts. As circumstances changed, however, it was realized that the old rule was no longer so necessary and that it was beginning to produce more harm than good. For this reason, the courts became more liberal in the allowance of amendments, and this change has continued until, at the present time, we may safely say that an amendment to a pleading may be made at almost any time, *so long*

*as such amendment does not prejudice the substantial
rights of the other party.* On the other hand, if the
allowance of an amendment would work an injustice
to the other party, the most liberal Codes and de-
cisions will not, at least openly, advocate or permit
it to be made. But, in order to prevent uncertainty
and individual prejudice from creeping into the law,
the question of what amendments will work an in-
justice must be measured by the application of general
principles determined and formulated in advance of
a particular case, and after a careful survey and com-
parison of all the possible effects of those principles,
applied to innumerable cases and over a long period
of time, and not by the conclusion of an individual
judge that the facts of the particular case, as he
believes the evidence shows them to exist, show that
an injustice would be done by a refusal to allow the
amendment. To this general principle, thus stated,
I am satisfied the majority of the court will accede.
The question is: What test should be used to deter-
mine when an amendment violates the rule?

This involves the consideration of that rule of law
known as the statute of limitations. If A really has
a right of action against B, there is no reason, as a
matter of abstract justice, why he should *ever* be
cut off from bringing it merely because a certain time
has elapsed since it accrued. And yet experience has
showed in every country which has ever developed
a judicial system that if a claimant were permitted to
attempt to enforce his asserted right in the court with-
out any limitation on the time in which he could
commence his action, many and great injustices would
be perpetrated.

The reason for and the result sought to be reached
by the statute of limitations have been discussed
repeatedly, but practically all of the authorities say

the same thing in regard thereto, although their language differs greatly. The matter is summed up succinctly in the case of *Riddlesbarger* v. *Hartford Fire Ins. Co.*, 7 Wall. (74 U. S.) 386, 390, 19 L. Ed. 257, as follows:

"They are founded upon the general experience of mankind that claims, which are valid, are not usually allowed to remain neglected. The lapse of years without any attempt to enforce a demand creates, therefore, a presumption against its original validity, or that it has ceased to subsist. This presumption is made by these statutes a positive bar; and they thus become statutes of repose, protecting parties from the prosecution of stale claims, when, by loss of evidence from death of some witnesses, and the imperfect recollection of others, or the destruction of documents, it might be impossible to establish the truth. The policy of these statutes is to encourage promptitude in the prosecution of remedies."

Notwithstanding this wise and salutary purpose, many of the courts, in their desire to do justice in an individual case, forget the evils which the statutes are intended to avert, and attempt to limit or minimize their application. The danger of this shortsighted conduct is shown by Mr. Justice STORY, in the case of *Bell* v. *Morrison,* 1 Pet. 351, 360, 7 L. Ed. 174, as follows:

"It has often been matter of regret, in modern times, that, in the construction of the statute of limitations, the decisions had not proceeded upon principles better adapted to carry into effect the real objects of the statute; that, instead of being viewed in an unfavorable light, as an unjust and discreditable defence, it had received such support, as would have made it, what it was intended to be, emphatically, a statute of repose. It is a wise and beneficial law, not designed merely to raise a presumption of payment of a just debt, from lapse of time, but to afford security against stale demands, after the true

state of the transaction may have been forgotten, or be incapable of explanation, by reason of the death or removal of witnesses. It has a manifest tendency to produce speedy settlements of accounts, and to suppress those prejudices which may rise up at a distance of time, and baffle every honest effort to counteract or overcome them. Parol evidence may be offered of confessions (a species of evidence which, it has been often observed, it is hard to disprove, and easy to fabricate), applicable to such remote times, as may leave no means to trace the nature, extent, or origin of the claim, and thus open the way to the most oppressive charges.''

And one of the chief methods by which the statute is evaded is through the reckless and unwarranted use of the otherwise beneficent rule which now permits the amendment of pleadings. It is, of course, recognized by all the courts that an action filed after the statute of limitations has run cannot be maintained. When the right of amendment began to be used freely, it frequently appeared that the proposed amendment did apparently change the cause of action. What were the courts to do with these two conflicting rules? The general principle to be applied appeared fairly clear. If the amendment really had the effect of setting up a different cause of action from that contained in the original complaint, the statute of limitations was applied. If, however, it merely explained or amplified the old cause of action, the statute was held inapplicable, through the use of the doctrine of relation. But how should one determine whether a new cause of action was stated by the amendment, or whether it was only an amplification of the original one. Where the amendment was more or less formal, involving the correction of some obvious and minor irregularity or omission in the complaint, no great difficulty was experienced. Two types of amendment, however, have caused a great

deal of controversy. The first class is found in cases where the original complaint did not, as a matter of procedural law, set up a complete cause of action, but did disclose one which, if properly pleaded, would be good. The second class appears where the complaint originally set up a perfect and complete cause of action, but where the amendment interjected new issues in the case, legal or factual. So far as the first type is concerned, in early days it was generally held that the action was not commenced until the complaint stated a good cause of action, and if the amendment was necessary to show a complete cause of action and was filed after the period of limitations expired, the statute applied. Such was the holding of this court in the case of *Keppler* v. *Becker*, 9 Ariz. 234, 80 Pac. 334. We, however, concluded at a later date that this rule was too harsh, and applied the principle of relation, holding that we would consider that the amendment related back to the filing of the original complaint, and that the bar of the statute did not apply if the original complaint had been filed in time. *Hagenauer* v. *Detroit Copper M. Co.*, 14 Ariz. 74, 124 Pac. 803, Ann. Cas. 1914C 1016; *Arizona Eastern R. Co.* v. *Old Dominion Copper etc. Co.*, 14 Ariz. 209, 127 Pac. 713; *Gambrell* v. *McKean*, 28 Ariz. 427, 237 Pac. 196. But in each of these later cases we explained, or implied more or less elaborately, that the doctrine of relation only applied *when the original complaint foreshadowed the precise cause of action made complete by the amendment* and still adhered to the rule that if the amendment did, in truth and in law, state a different cause of action, the statute applied thereto as of the date of its filing.

In none of these cases, however, did we either expressly or impliedly state what was the standard by which we should determine whether when the

original complaint on its face stated a complete cause of action, the amendment offered set up another one. This question was definitely settled for the first time in this state in the case of *Kunselman* v. *Southern Pac. R. Co.*, 33 Ariz. 250, 263 Pac. 939, 941. We reviewed all of the Arizona cases above cited and held specifically that they only applied when "an amendment to the complaint is but a perfected statement of the cause of action originally attempted to be pleaded." We then discussed the test to be used in determining whether a new cause of action was stated. It was urged that in the case cited the same debt lay at the basis of both the original and amended complaint, and that since the difference between them was merely in the method of statement, there was no new cause of action set up. We pointed out that this contention was fallacious and held as follows: "The test generally laid down for a departure is *whether proof of additional facts will be required*," and this test, approved by the leading text-writers and the vast majority of cases, has not yet been repudiated by this court. Nor do I understand the majority opinion to claim that it is not the correct test and that we should not apply it to all cases which come before us. The contention seems rather to be (a) that the evidence adduced at the trial shows the contract between the parties really contained the condition which the amendment attempted to add to the contract first pleaded; (b) that though such condition changed the legal effect of the contract pleaded, and of the ground on which recovery was sought, since it referred to the same stock the cause of action could not have been changed; (c) the evidence required to support the amendment was "in large part" the same as required to support the original complaint; and (d) at any rate, since defendant always knew the

condition contained in the amendment was really in the contract, it was not injured by being compelled to meet that issue.

Let us consider these contentions in their order. If courts are permitted to allow their belief as to the truth or falsity of plaintiff's latest theory of his case to affect their conclusion as to whether an amendment to a complaint which removes, by relation, the bar of the statute of limitations may be made, that statute, as applied to any action upon an alleged contract, is absolutely destroyed, for if a litigant may, at a trial and after the statute has run, set up a contract *different in legal effect* from that which he has first pleaded, merely because the trial judge believes that the alleged new contract was actually made, the test is no longer "what time has elapsed since the making of the alleged contract," but "does the trier of fact believe it was made as alleged." Nor is the second contention founded on sound principle. One might as well say that an action for breach of a contract for the lease of a house was identical with one for specific performance of a contract for the sale of a house, because they both refer to the same piece of property. The third contention is what the old common-law pleaders used to call a negative pregnant. The statement that the evidence required under the amendment was "in large part" the same as that under the original one is, in effect, an admission that there *was* a difference, and, as I shall point out later, that difference was a vital one. The fourth and last contention, that the defendant knew the true terms of the contract, and therefore would not be injured by its being pleaded, contains the same fatal error as the first, to wit, the court assumes *in advance* that the original contract in truth contained the clause last pleaded by the plaintiff. The contract set up in

the original complaint created certain definite legal rights and obligations, and no others, and the complaint alleges that a certain obligation of defendant set forth in this specific contract, and no other, was breached. What was this duty and what was the alleged breach? The duty was the promise of the defendant that it would not sell its stock in the eastern part of the United States, and the breach alleged was that it had sold stock in the prohibited territory. What did plaintiff need to prove in order to sustain the allegations of his complaint? He must prove that the contract did contain the provisions referred to, and that the stock was sold in the eastern part of the United States together, of course, with his damages. When these three things were established, he was *prima facie* entitled to a verdict. Suppose, then, under the original complaint, he had offered to prove that the contract also contained the provision that the stock should not be sold in the west for less than 75 cents per share, and that a sale had been made there at a lower figure. The court would unquestionably and properly have sustained an objection to such evidence as incompetent and immaterial, and as bearing on none of the issues of the case.

In the complaint, as modified by the trial amendment, plaintiff set up a contract which contained certain legal rights and obligations *not found in the contract which he had originally pleaded,* and he sought damages for a violation of one of those newly stated obligations. Would the evidence which was sufficient to sustain a verdict for breach of the obligation relied on under the first complaint have sustained a verdict for a breach of the new obligation? Of course not! What was it necessary to prove under the amended complaint? He must show the very

things which he would not have been permitted to
offer in evidence on the original complaint, to wit, the
new clause in the contract and the breach of that
particular clause. It thus appears beyond the possi-
bility of contradiction that the things which he must
prove, in order to support his amendment, were
things which he would not have been permitted, let
alone required, to prove under the original complaint.
And yet it is claimed new evidence is not required
to support the amendment! If the majority opinion
be correct, all that is necessary for a plaintiff to do
whenever he finds himself unable to prove the cause
of action set forth in a contract as pleaded, in order
to base his action upon a condition of a contract and
a breach thereof, which is entirely different in its
legal effect and the proof necessary to sustain it from
the contract and breach set forth in his original
complaint, is to claim that the new clause is an addi-
tional and overlooked part of the contract as first
pleaded, made at the same time and place and in
regard to the same subject-matter. If this be true,
the plaintiff herein might, if it appeared at the next
trial of the case that he was unable to prove an agree-
ment not to sell at less than 75 cents per share, or a
sale below that amount, again amend by alleging that
"as a part of the original agreement" defendant
promised plaintiff that in case he could not make any
sale of the stock it would pay him $10,000 for his
lost time, and recover on that theory. If the trial
court refused to allow that amendment, we would
be bound to reverse the judgment, and at the third
trial he might, with equal propriety, failing to prove
this alleged provision of the contract, set up that he
had just remembered it also promised to give him
for his services, as a premium, 50,000 shares of the
stock, and ask that such amendment be allowed be-

cause, forsooth, it was all part of the same transaction, made at the same time and relating to the same subject-matter. Theoretically, he might at each new trial add to his contract such additional terms as he wished, *ad nauseam,* provided only that he claimed they were made at the same time and place and regarding the same stock, and that the trial judge, from the evidence *then* offered, believed that the contract had actually been so made.

The majority opinion cites many cases as sustaining their conclusion. While general language may be found in some of these cases which will do so, in none of them, with the possible exception of *Thouvenin* v. *Lea,* 26 Tex. 612, do the facts show an attempt to add a new condition to a valid contract already pleaded, and a reliance on a breach of that new condition alone. And even in *Thouvenin* v. *Lea, supra,* it does not appear definitely that the reliance for recovery was on a breach of the "additional stipulation." The only cases which I have been able to find where the proposed amendment varied the legal effect of the contract first pleaded are *Lamar* v. *Lamar,* 118 Ga. 850, 45 S. E. 671, *Livingston* v. *Malever,* 103 Fla. 200, 137 So. 113, and *Thomas* v. *B. & O. R. Co.,* (D. C.) 300 Fed. 470, and in each of these the court refused to allow the amendment on the ground that a new cause of action was stated thereby. I am of the opinion that the general rule of law to be applied to amendments of this nature is correctly stated in the Kunselman case, *supra,* and that the proper application of that rule would sustain the trial judge in his action in refusing to allow the amendment.

There are a number of other points raised on the appeal, but since this is the principal one discussed by the majority of the court and the one upon which they have relied chiefly for a reversal of the case,

280

and since most of the others on which I differ from the majority involve merely the erroneous construction of a specific contract, and not the establishment of an erroneous general principle, and, therefore, are not likely to create a dangerous precedent, it is unnecessary for me to refer to them other than to say that I think if the correct rule were adopted in regard to the trial amendment, the other alleged errors are not sufficient to require a reversal of the case.

The judgment should be affirmed.